**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| GENESIS GSA STRATEGIC ONE, LLC | |
| Plaintiff, | |
| v. | Case No. 1:26-cv-00915-ABA <br> **FILED UNDER SEAL** |
| HOWARD COUNTY, *et al.*, | |
| Defendants. | |

**STATE OF MARYLAND FEDERAL RULE OF CIVIL PROCEDURE 5.1 BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

    I.    The Dignity Not Detention Act ................................................................................... 2

    II.   The Elkridge Property ................................................................................................ 3

    III.  Immigration Detention in Maryland ......................................................................... 6

PROCEDURAL BACKGROUND ........................................................................................ 9

ARGUMENT ........................................................................................................................ 11

    I.    The As-Applied Constitutional Challenge to Md. Code Ann., Corr. Servs. § 1-102(b) Is Not Ripe. ............................................................................................................... 11

        A.    The sole action challenged by Genesis—revocation of its building permits—was done pursuant to the Howard County Building Code, not Section 1-102(b). ........................ 12

        B.    Because Section 1-102(b) was never applied against Genesis, the factual record cannot show the statute is unconstitutional as applied in this case. ........................................ 15

    II.   If The Court Reaches the Constitutional Question, Section 1-102(b) Is Constitutional.... 17

        A.    Section 1-102(b) does not violate the intergovernmental immunity doctrine. ............. 18

            1.    Section 1-102(b) does not directly regulate the federal government. ...................... 19

            2.    Section 1-102(b) does not discriminate against the federal government. ................. 20

        B.    Section 1-102(b) is not preempted. .......................................................................... 25

CONCLUSION ..................................................................................................................... 29

i

## TABLE OF AUTHORITIES

### Cases

*Amaya v. DGS Constr.*, 479 Md. 515, 278 A.3d 1216 (2022) ........................................................ 14

*Arizonans for Official Eng. v. Arizona*, 520 U.S. 43 (1997) ..................................................... 13, 16

*Assateague Coastal Tr. v. Schwalbach*, 448 Md. 112, 136 A.3d 866 (2016) ............................... 13

*Atay v. County of Maui*, 842 F.3d 688 (9th Cir. 2016) ................................................................. 26

*Bryant Woods Inn v. Howard County*, 124 F.3d 597 (4th Cir. 1997) ........................................... 25

*C.Y. Wholesale v. Holcomb*, 965 F.3d 541 (7th Cir. 2020) .......................................................... 26

*Califano v. Sanders*, 430 U.S. 99 (1977) ......................................................................................11

*Cap. Associated Indus. v. Stein*, 922 F.3d 198 (4th Cir. 2019) .................................................... 25

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003) ........................... 16

*CoreCivic, Inc. v. Gov'r of New Jersey*, 145 F.4th 315 (3d Cir. 2025) ........................................ 19

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ..................................................... 25

*D.N.N. v. Liggins*, 822 F. Supp. 3d 543 (D. Md. 2026) .................................................... 6, 7, 23, 24

*Dawson v. Steager*, 586 U.S. 171 (2019) ..................................................................................... 21

*Educ. Media Co. at Va. Tech v. Insley*, 731 F.3d 291 (4th Cir. 2013) ......................................... 15

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995) ..................................................................... 26

*Gardner v. Ally Fin.*, 488 F. App'x 709 (4th Cir. 2012) ............................................................... 13

*Geo Grp. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) ...................................................................... 19

*Geo Grp. v. City of Tacoma*, No. 3:18-CV-05233-RBL, 2019 WL 5963112 (W.D. Wash. Nov. 13, 2019) ..................................................................................................................................... 24

*Geo Grp. v. Inslee*, 151 F.4th 1107 (9th Cir. 2025) ................................................. 18, 21, 22, 26

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ............................................................................. 18, 26

*Hancock v. Train*, 426 U.S. 167 (1976) ....................................................................................... 19

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ..................................................................................... 16

*Immigr. Legal Res. Ctr.  v. City of McFarland*, 478 F. Supp. 3d 988 (E.D. Cal. 2020) .............. 22

ii

*In re Isely*, 489 Md. 374, 330 A.3d 682 (2025)................................................................ 14

*In re J.J.*, 456 Md. 428, 174 A.3d 372 (2017)................................................................... 14

*Johnston v. Lamone*, 401 F. Supp. 3d 598 (D. Md. 2019) ...............................................11

*Just Puppies v. Frosh*, 565 F. Supp. 3d 665 (D. Md. 2021) ........................................... 26

*Lansdowne on the Potomac Homeowners Ass'n v. OpenBand & Lansdowne*, 713 F.3d 187 (4th Cir. 2013)......................................................................................................................11

*Lansdowne on the Potomac Homeowners Ass'n v. OpenBand & Lansdowne*, 801 F. App'x 116 (4th Cir. 2020) ...............................................................................................................11

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) ..................................................... 20

*Lipsitz v. Parr*, 164 Md. 222, 164 A. 743 (1933)........................................................... 14

*Lipsitz v. Parr*, 267 F.2d 942 (4th Cir. 1959) ................................................................. 14

*Little v. Mayor & City Council of Ocean City*, No. CV ELH-18-360, 2019 WL 4689238 (D. Md. Sept. 26, 2019) ................................................................................................. 14

*Lynchburg Republican City Comm. v. Va. Dep't of Elections*, 793 F. Supp. 3d 765 (W.D. Va. 2025)............................................................................................................................. 12

*Madison v. Reichelt*, 158 F. Supp. 401 (D. Md. 1958)................................................... 14

*Maryland v. Mullin*, No. CV 26-733-BAH, 2026 WL 1045503 (D. Md. Apr. 17, 2026) ............... 3

*McHenry County v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ................................... 18, 21, 26

*Md. Auto. Ins. Fund v. Baxter*, 186 Md. App. 147, 973 A.2d 243 (2009)..................... 14

*Md. Comm'n on Hum. Rels. v. Downey Commc'ns*, 110 Md. App. 493, 678 A.2d 55 (1996)...... 15

*MLC Auto. v. Town of S. Pines*, 532 F.3d 269 (4th Cir. 2008) ...................................... 17

*Murphy v. NCAA*, 584 U.S. 453 (2018) ......................................................................... 25

*N. Va. Hemp & Agric. v. Virginia*, 125 F.4th 472 (4th Cir. 2025)........................... 25, 29

*NetChoice v. Bonta*, 790 F. Supp. 3d 798 (N.D. Cal. 2025) ......................................... 16

*North Dakota v. United States*, 495 U.S. 423 (1990)..................................................... 21

*Nwauzor v. GEO Grp.*, 127 F.4th 750 (9th Cir. 2025) ....................................... 20, 21, 29

*Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084 (N.D. Cal. 2025) ............................. 24

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev't Comm'n*, 461 U.S. 190 (1983) ................................................................................................................................11, 16, 27

*Pomponio v. Fauquier County Bd. of Supervisors*, 21 F.3d 1319 (4th Cir. 1994) ........................ 17

*Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025) ............................................................. 16

*Public Utilities Comm'n v. United States*, 355 U.S. 534 (1958) .................................................... 20

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996) ................................................................. 17

*Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180 (4th Cir. 2007) .......................................... 15

*Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165 (4th Cir. 2009) .................................. 15

*Rockville Cars v. City of Rockville*, 891 F.3d 141 (4th Cir. 2018) ................................................ 15

*Tafflin v. Levitt*, 493 U.S. 455 (1990) ........................................................................................... 18

*Texas v. United States*, 523 U.S. 296 (1998) ................................................................................ 15

*Town of Berwyn Heights v. Rogers*, 228 Md. 271, 179 A.2d 712 (1962) ..................................... 14

*Trumbull Ins. Co. v. Int'l Mktg. Grp.*, No. 21-CV-2855-ABA, 2024 WL 4753369 (D. Md. Nov. 12, 2024) ...................................................................................................................................... 13

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ............................................................ 18

*United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025) ....................................... 21, 23, 26

*United States v. New York*, 810 F. Supp. 3d 329 (N.D.N.Y. 2025) .............................................. 21

*United States v. Town of Windsor, Conn.*, 496 F. Supp. 581 (D. Conn. 1980) ............................. 13

*United States v. Washington*, 596 U.S. 832 (2022) ................................................................. 18, 21

*W. Star Hosp. Auth. v. City of Richmond*, 986 F.3d 354 (4th Cir. 2021) ...................................... 28

*Whitaker v. Monroe Staffing Servs.*, 42 F.4th 200 (4th Cir. 2022) ................................................ 11

*Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281 (4th Cir. 2022) ............................................ 11

*Wyeth v. Levine*, 555 U.S. 555 (2009) .......................................................................................... 26

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ...................................................................................... 22

## Other Authorities

COMAR 09.12.51.04A(1) ................................................................................................ 22

Dignity Not Detention Act, H.B. 16, 2021 Leg., 443rd Sess. (Md. 2021) ..................................... 2

Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. ............................................................ 7

International Building Code (2021), § 308.4 .................................................................................. 22

Md. Code Ann., Alc. Bevs. § 3-601 ............................................................................................... 14

Md. Code Ann., Corr. Servs. § 1-101 ............................................................................................... 2

Md. Code Ann., Corr. Servs. § 1-102(b) ................................................................................. passim

Md. Code Ann., Cts. & Jud. Proc. § 12-603 .................................................................................. 13

Md. Code Ann., Pub. Safety § 5-310(b) ......................................................................................... 14

Pub. L. 119-21, § 90003, 139 Stat. 72, 358 (July 4, 2025) ............................................................. 3

## Miscellaneous Authorities

Christopher Cann, *Will that warehouse become an ICE detention center? Locals push back.*, USA Today (Feb. 5, 2026), https://www.usatoday.com/story/news/nation/2026/02/05/ice-warehouse-communities-push-back/88495305007/ [https://perma.cc/L9RK-9FXR] ................ 2

Hamed Aleaziz, *ICE Spent $700 Million on 7 Warehouses. Now It Wants to Get Rid of Them.*, N.Y. Times (June 18, 2026), https://www.nytimes.com/2026/06/18/us/politics/ice-warehouses-immigration.html [https://perma.cc/DVG3-GPAN] ..................................................... 3

ICE, ERO, Directive 11087.2, Operations of ERO Holding Facilities § 3.3 (2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf [https://perma.cc/Z5Q9-CDZT] . 6

John-John Williams IV et al., *Viral video provides rare look inside crowded ICE holding room in Baltimore*, Balt. Banner (Jan. 27, 2026, 5:30 AM), https://www.thebanner.com/politics-power/national-politics/viral-video-baltimore-ice-holding-room-immigrants-DWH3RIXO45CDRGZDZA4QPA3JNQ/ [https://perma.cc/67SD-N2BD] ............................. 7

Lillian Reed, *Hundreds pack hearing on Howard County proposal to ban immigrant detention facilities*, Balt. Banner (Feb. 4, 2026), https://www.thebanner.com/politics-power/national-politics/howard-county-ice-detention-facility-ban-TCI4JVZYFJC3NBKO542XF6TMFQ/ [https://perma.cc/DX5L-GDP3] ................................................................................................ 27

Press Release, Howard County, Howard County Executive Calvin Ball to Submit Emergency Legislation Prohibiting Permitting of Privately-Owned Detention Centers (Jan. 30, 2026), https://www.howardcountymd.gov/News013026 [https://perma.cc/KZ4V-GPQ9].............. 7, 23

**INTRODUCTION**

Pursuant to this Court's invitation, the State of Maryland submits this brief addressing the constitutionality of Md. Code Ann., Correctional Services ("CS") § 1-102(b) as applied to Howard County's revocation of two local building permits issued to Genesis GSA Strategic One, LLC ("Genesis") to renovate a commercial building in Elkridge, Maryland.  But, before addressing the constitutional question, the State avers that the constitutionality of Section 1-102(b)—a provision of Maryland's Dignity Not Detention Act—is not ripe.  Section 1-102(b) is focused on what is required prior to the issuance of a permit and does not by its own terms direct a revocation of an invalidly issued permit.  Instead, the statute is silent regarding such a situation.  Genesis's claims thus arise solely from Howard County's revocation of its building permits under the County's Building Code.  Moreover, Howard County has not initiated a notice-and-comment period to date, so Section 1-102(b)'s procedural requirement has not been applied to the Elkridge property, and the Court lacks a factual record to assess its constitutionality as applied here.  Thus, any as-applied challenge is not ripe, and this Court should decline to address whether Section 1-102(b) would be constitutional as applied to this case.

Should the Court nevertheless reach the constitutional issue, Section 1-102(b) is constitutional if applied to the Elkridge property.  First, the federal government, through its lease with Genesis, voluntarily subjected Genesis to state and local permitting requirements, foreclosing any direct regulation challenge.  Second, the statute does not discriminate against the federal government, as Genesis cannot identify a comparable non-immigration detention facility to immigration "hold rooms."  Finally, the statute's six-month notice-and-comment requirement does not obstruct federal operations; indeed, permitting and construction processes likely exceed that timeframe (and did so in the instance before the Court).

1

Accordingly, the State of Maryland respectfully requests that this Court decline to opine on Section 1-102(b)'s constitutionality at this stage or, in the alternative, hold that Section 1-102(b) is constitutional as applied to the Elkridge property.

## FACTUAL BACKGROUND

### I.    The Dignity Not Detention Act

Like other Americans, Marylanders want to participate in discussions surrounding the construction of immigration detention facilities in their communities. *See, e.g.*, Christopher Cann, *Will that warehouse become an ICE detention center? Locals push back.*, USA Today (Feb. 5, 2026), https://www.usatoday.com/story/news/nation/2026/02/05/ice-warehouse-communities-push-back/88495305007/ [https://perma.cc/L9RK-9FXR]. In 2021, the General Assembly enacted the Dignity Not Detention Act to ensure, among other things, that any immigration detention facilities built in Maryland would be subject to robust public discussion. *See* Dignity Not Detention Act, H.B. 16, 2021 Leg., 443rd Sess. (Md. 2021); 2021 Md. Laws ch. 19 [hereinafter "the Act"]. As relevant to this case, the Act provides that:

> The State, a unit of local government, a county sheriff, or an agency, officer, employee, or agent of the State or a unit of local government may not . . . issue a permit for the construction of a building or the reuse of existing buildings or structures by any private entity for use of as an immigration detention facility unless the governmental entity:
>
> (1) provides notice to the public at least 180 days before . . . issuing the permit; and
>
> (2) solicits and hears public comments on the proposed . . . permit action in at least two separate meetings open to the public.

*Id.* (codified at CS § 1-102(b)). The Act defines an "[i]mmigration detention facility" as "any building, facility, or structure used, in whole or in part, to house or detain individuals for federal civil immigration violations." *Id.* (codified at CS § 1-101(j)).

2

The Act thus reflects the State's interest in transparency regarding plans to develop new immigration detention facilities. Although Congress recently allocated $45 billion to expand immigration detention nationwide, *see* Pub. L. 119-21, § 90003, 139 Stat. 72, 358 (July 4, 2025), federal and state law continue to impose procedural requirements designed to promote transparency in the construction and operation of these facilities. *See Maryland v. Mullin*, No. CV 26-733-BAH, 2026 WL 1045503, at *1 (D. Md. Apr. 17, 2026) (concluding that the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) "purchasing a large warehouse in Williamsport, Maryland built to hold cargo, and seeking to quickly convert it into a detention facility designed to house human beings," "provide[ ] a crystal-clear example of a federal agency failing to comply with the basic requirements of the National Environmental Policy Act"); *see also* Compl., *Maryland v. Lyons*, No. 1:26-cv-01024-JRR, ECF 1 (D. Md. Mar. 10, 2026) (seeking to enforce an administrative subpoena and *Touhy* request for information regarding conditions in Baltimore ICE hold rooms). The Trump administration itself has responded to public feedback, backing away from plans to house detainees in several locations after public outcry. *See* Hamed Aleaziz, *ICE Spent $700 Million on 7 Warehouses. Now It Wants to Get Rid of Them.*, N.Y. Times (June 18, 2026), https://www.nytimes.com/2026/06/18/us/politics/ice-warehouses-immigration.html [https://perma.cc/DVG3-GPAN] (noting that ICE plans to sell warehouses it bought to detain immigrants in Michigan, Georgia, Pennsylvania, Utah, and New Jersey).

## II.     The Elkridge Property

In 2022, the federal government issued a bid solicitation titled "U.S. Government Seeks to Lease Office and Other Related Space in Baltimore, Maryland," seeking proposals to lease approximately 28,000 square feet of commercial space for a 15-year term with a 5-year extension option. *See* Decl. of Lonnie Brand Hartsell in Supp. of Pl.'s Mot. for Prelim. Inj. ¶ 4, ECF 16-2

3

(Mar. 13, 2026); *see also* U.S. General Services Administration (GSA) Request for Lease Proposals No. 1MD2241 Baltimore, MD (Nov. 21, 2022), Ex. A to Pl.'s Mot. for Prelim. Inj. 5–6, ECF 16-3 (Mar. 13, 2026) [hereinafter "Request for Lease Proposals"].

Genesis identified "a freestanding commercial building" at 6522 Meadowridge Road in Elkridge, Maryland (hereinafter the "Elkridge property") that could meet the federal requirements with renovation. *See* Hartsell Decl. ¶ 5. On January 4, 2023, Genesis submitted a lease proposal to GSA for the Elkridge property. *See id.* ¶¶ 6, 9. Genesis subsequently won the bid and purchased the Elkridge property. *See id.* ¶ 9.

On or about May 16, 2023, Genesis entered into lease agreement GS-03P LMD00795 with the United States through GSA. *See* Lease No. GS-03P LMD00795 (May 16, 2023), ECF 34, at 3, 87–88 (May 14, 2026) [hereinafter "Lease Agreement"]; *see also* Am. Compl. ¶ 33, ECF 40 (June 5, 2026). The lease agreement states that Genesis "shall comply with all Federal, state, tribal, and local laws applicable to its ownership and leasing of the property, including, without limitation, laws applicable to the construction, ownership, alteration or operation of all buildings, structures, and facilities located thereon, and obtain all necessary permits, licenses and similar items at its own expense." Lease No. GS-03PLMD00795, Ex. F, ¶ 14, at 69 (General Services Administration Regulation (GSAR) 552.270-8 titled "Compliance with Applicable Law").

Nearly eighteen months after Genesis entered into the lease agreement with the federal government, on or about September 27, 2024, an application was submitted to the Howard County Department of Inspections, Licenses and Permits ("DILP") for building permits for the Elkridge property. *See* Hartsell Decl. ¶ 11.

Genesis alleges that during DILP's initial review of the permit application, the Department "questioned the applied-for use of the facility due to the detainee holding areas in the drawings"

and "claimed that the use of the Elkridge property should be in the I-3 use category (Institutional) instead of in the General Business use category."[1]  *See id.* ¶ 13.  Genesis asserts that it disagreed with the I-3 designation but requested—and DILP agreed—to split the permit application into two main permits.  *See id.*

On February 18, 2025, DILP issued Genesis commercial alteration permit number B24004317 with the following description of work: "Genesis GS, Strategic One LLC/ Improvement of tenant space only (restrooms and common area).  Existing building egress and fire ratings not changed."[2]  *See* Commercial Alteration Permit B24004317, Ex. B to Pl.'s Mot. for Prelim. Inj., ECF 16-4.  And on August 5, 2025, DILP issued Genesis commercial alteration permit number B24003712 with the following description of work: "General Services Administration/ Scope of work includes improvement of tenant spaces support areas, detention facility, detainee processing and secured waiting area."[3]  *See* Commercial Alteration Permit B24003712, Ex. C to Pl.'s Mot. for Prelim. Inj., ECF 16-5.

The federal government plans to use the Elkridge property, at least in part, for immigration detention purposes.  *See* Statement of Interest of the United States 3, ECF 24 (Apr. 3, 2026).  Yet, in this litigation, it is Genesis—not the federal government—that has described the proposed nature of that detention component.  Genesis asserts that "more than 96% of the Elkridge property is to consist of office space and in less than 1,100 square feet will there be holding cells and a

---

[1] "I-3," or "Institutional Group 3," refers to an occupancy classification under the International Building Code.

[2] The application date for this permit is November 12, 2024.  *See* Commercial Alteration Permit B24004317, ECF 16-4.

[3] The application date for this permit is September 27, 2024.  *See* Commercial Alteration Permit B24003712, ECF 16-5.

detainee shower" and that "[t]here are no beds in the facility." *See* Hartsell Decl. ¶ 8. Genesis further asserts that detainees will be "held in the[ ] [holding] cells only pending the processing and interview process," and "transferred out prior to the facility closing for the night, at 6:00 p.m.," and that "the facility will not host detainees overnight." *See id.*

### III.    Immigration Detention in Maryland

There are currently no long-term immigration detention facilities in the State of Maryland. *See D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 561–62 & n.9 (D. Md. 2026). ICE, however, temporarily detains individuals in hold rooms in the Baltimore Field Office for ICE Enforcement and Removal Operations (ERO) located in the George H. Fallon Federal Building at 31 Hopkins Plaza, Baltimore, Maryland 21201. ICE defines a "hold room" as a "holding cell, cell block, or other secure enclosure within a holding facility." ICE, ERO, Directive 11087.2, Operations of ERO Holding Facilities § 3.3 (2024), https://www.ice.gov/doclib/foia/policy/directive11087.2.pdf [https://perma.cc/Z5Q9-CDZT]. A "holding facility" is "a facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency." *Id.* § 3.2. The Baltimore Holding Facility includes five "hold rooms" with a combined size of 1,728 square feet. *See* Defs.' Suppl. Interrog. Resp. 5, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 127-9 (Dec. 23, 2025).

Further, while ICE defines "short-term" as "a period not to exceed 12 hours, absent exceptional circumstances," Directive 11087.2 § 3.2 n.3, due to a nationwide waiver, ICE holding facilities can now detain individuals for up to 72 hours, absent exceptional circumstances, *see* Memorandum from Monica Burke, Assistant Director, Custody Management, to All ERO Field Office Directors 1 (June 24, 2025), *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 40-3 (D. Md. June 30,

6

2025) (describing how "[a]s a result of increased immigration enforcement efforts, ERO's average daily population has significantly increased to over 54,000" and that because "field offices no longer have the option to discretionarily release [noncitizens], nor decline to take [noncitizens] into custody from counterparts" in Homeland Security Investigations or U.S. Customs and Border Protection, "field offices have had to resort to holding aliens in holding facilities beyond . . . the 12 hour limit").

In late January 2026, a video circulated online showing numerous individuals held in what appeared—and was later confirmed—to be the Baltimore hold rooms. *See* John-John Williams IV et al., *Viral video provides rare look inside crowded ICE holding room in Baltimore*, Balt. Banner (Jan. 27, 2026, 5:30 AM), https://www.thebanner.com/politics-power/national-politics/viral-video-baltimore-ice-holding-room-immigrants-DWH3RIXO45CDRGZDZA4QPA3JNQ/ [https://perma.cc/67SD-N2BD].  Individuals in the video say that they have been detained for ten days, assaulted, and denied food and proper hygiene.  *See* Transcript of Video from the Baltimore Hold Room, *D.N.N.*, No. 1:25-cv-01613-JRR, ECF 129-1 (D. Md. Jan. 26, 2026).  The Maryland Office of the Attorney General ("OAG") opened an investigation into whether the alleged conduct violated civil rights laws and other federal laws, such as the Immigration and Nationality Act, 8 U.S.C. § 1101 et seq.  *Cf.* Compl. ¶¶ 28–30, *Lyons*, No. 1:26-cv-01024-JRR, ECF 1.

Around the same time, on January 30, 2026, Howard County issued a press release announcing plans to submit emergency legislation to "prohibit the permitting of privately-owned buildings operating as detention centers in Howard County."  *See* Press Release, Howard County, Howard County Executive Calvin Ball to Submit Emergency Legislation Prohibiting Permitting of Privately-Owned Detention Centers (Jan. 30, 2026), https://www.howardcountymd.gov/News013026 [https://perma.cc/KZ4V-GPQ9].  The press

release stated that a "third-party permitting company known as McKeever Services, located in Fairfax, VA, has applied for and received a permit to renovate" the Elkridge property and that the "Howard County Government is unaware of any specific lease agreements or contracts between McKeever Services or Genesis GSA Strategic One, LLC and any federal agency." *Id.* The press release further stated that the "work performed under the permit appears to be nearing completion" and the "most recent inspection was passed with conditions on December 29, 2025" but that "certain areas remain to be reinspected and approved prior to issuance of a Use & Occupancy certificate." *Id.*

On February 2, 2026, DILP sent Genesis a written notice revoking Permit B24003712. *See* Notice of Permit Revocation: B24003712, Ex. D to Pl.'s Mot. for Prelim. Inj., ECF 16-6 ("Revocation Letter"); *see also* Hartsell Decl. ¶ 25, ECF 16-2. The notice explained that "[r]ecent reporting and leasing advertisements have indicated that this privately-owned building is intended for occupancy by" ICE. *See* Revocation Letter. It further noted that "Howard County has reason to believe that the [Elkridge property] meets the definition of an 'immigration detention facility'" under state law and restated the requirements of Section 1-102(b). *Id.* The notice concluded that DILP revoked the permit "[p]ursuant to § 105.6 of the Howard County Building Code," which authorizes the Department "to suspend or revoke a permit issued under the provisions of this code where the permit is issued in error or on the basis of incorrect, inaccurate or incomplete information, or in violation of any ordinance or regulation or any of the provision of this code." *Id.* Genesis allegedly also received an email from Howard County revoking Permit B24004317 that "relied on the same revocation reasoning set forth in the Revocation Letter." *See* Am. Compl. ¶ 48; *see also* Hartsell Decl. ¶ 25.

8

Howard County enacted emergency legislation—Council Bill 16-2026—on February 5, 2026.  *See* Ex. C to Complaint, ECF 1-3.  Council Bill 16-2026 provides that "[n]o owner or owner's authorized agent, other than a government agency, is eligible to make application, obtain, or hold a permit for I-3 Use Group" (which includes detention facilities).  *Id.*

## PROCEDURAL BACKGROUND

One month after the permit revocations, on March 4, 2026, Genesis filed a federal complaint against Howard County, DILP, DILP's Director, and several Howard County elected officials (collectively referred to herein as Howard County) challenging the County's decision to revoke the permits and enact Council Bill 16-2026.  *See* Compl., ECF 1.  On March 13, Genesis filed a motion for a preliminary injunction and for expedited consideration.  *See* Mot. for Prelim. Inj., ECF 16 (Mar. 13, 2026).  Howard County moved to dismiss the complaint and opposed the preliminary-injunction motion.  *See* Defs.' Mot. to Dismiss, ECF 18 (Mar. 27, 2026); Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj., ECF 19 (Mar. 27, 2026).  The United States also filed a statement of interest.  *See* Statement of Interest of the United States, ECF 24.

On May 14, the Court held a motions hearing.  *See* ECF 33.  After the hearing, Genesis submitted a sealed copy of the lease agreement.  *See* ECF 34 (May 14, 2024).  Upon "considering this lease," Howard County confirmed in a letter to the Court that "Council Bill 16-2026 will not have application to the building permit for the property under the lease that has been supplied, because a government entity is and will be responsible for this detention facility."  *See* Letter from David R. Moore, Senior Assistant County Solicitor, to U.S. District Judge Adam B. Abelson 1, ECF 36 (May 21, 2026).

On June 4, the Court issued an order addressing the pending motions and setting a briefing schedule.  *See* Order, ECF 38.  The Court concluded that because Genesis "cannot contend that"

9

Council Bill 16-2026 "has ever been applied to the Elkridge property" or "will be applied to the Elkridge project in the future," "the majority of Plaintiff's complaint and motion for preliminary injunction are now moot." *See id.* at 3. The Court observed that Genesis had asserted that "the remaining basis for the permit revocation is Md. Code Ann., Correctional Services Art., § 1-102(b), which [Genesis] contends was unconstitutionally applied to its property." *See id.* It therefore directed Genesis to file and serve on the State of Maryland an amended complaint, as well as any renewed preliminary-injunction motion, limited to the remaining claims, and invited the State to brief the constitutional question. *See id.* at 4.

On June 8, OAG accepted electronic service of twenty documents, including Genesis's amended complaint, *see* ECF 40 (June 5, 2026); its supplement to the preliminary-injunction motion, *see* ECF 41 (June 5, 2026); and its notice of a constitutional question under Federal Rule of Civil Procedure 5.1(a), *see* ECF 43 (June 5, 2026). *See* State's Resp. to Pl.'s Emergency Motion to Amend the Court's June 4 Order 2, ECF 45 (June 8, 2026). The Rule 5.1 notice states that Genesis's filings "argue that Defendants' application of Maryland Correctional Services Code § 1-102(b) to revoke the building permits they issued to Genesis violated the United States Constitution." *See* Pl.'s Notice of Constitutional Question 1–2. Howard County moved to dismiss the amended complaint and opposed Genesis's renewed preliminary injunction motion. *See* Defs.' Opp'n to Pl.'s Supp. Prelim. Inj. Mot., ECF 53 (June 22, 2026); Defs.' Mot. to Dismiss Pl.'s First Am. Compl., ECF 54 (June 22, 2026).

The State now submits this brief under Rule 5.1 and pursuant to the Court's invitation to address "the constitutionality of Md. Code Ann., Correctional Services Art., § 1-102(b) as applied to the Elkridge property." *See* Order 4, ECF 38; Order 2, ECF 47.

## ARGUMENT

### I.    The As-Applied Constitutional Challenge to Md. Code Ann., Corr. Servs. § 1-102(b) Is Not Ripe.

The Court need not address the constitutionality of Section 1-102(b) as applied to the Elkridge property because that issue is not ripe.  Ripeness—one of the Article III justiciability doctrines—"prevents federal courts from weighing in on a controversy until it is presented in 'clean-cut and concrete form.'"  *Johnston v. Lamone*, 401 F. Supp. 3d 598, 607 (D. Md. 2019) (Blake, J.) (quoting *Lansdowne on the Potomac Homeowners Ass'n v. OpenBand & Lansdowne*, 713 F.3d 187, 198 (4th Cir. 2013)), *aff'd mem.*, 801 F. App'x 116 (4th Cir. 2020) (per curiam).  "[T]he question of ripeness turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'"  *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev't Comm'n*, 461 U.S. 190, 201 (1983) ("*PG&E*") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).  "The plaintiff bears the burden of establishing ripeness." *Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281, 293 (4th Cir. 2022) (quoting *Whitaker v. Monroe Staffing Servs.*, 42 F.4th 200, 206 (4th Cir. 2022)).

Here, Genesis cannot show any constitutional challenge to Section 1-102(b) of the Correctional Services Article is ripe because its lawsuit focuses entirely on the revocation of its building permits. *E.g.*, Am. Compl. 28–29 (asking the Court to "[d]eclare that Howard County's revocation of Genesis's Permits . . . violate[d] the Supremacy Clause of the United States Constitution," and to "[d]irect Howard County to reinstate or reissue the Permits and any other permits, authorizations, and approvals necessary for Genesis to perform its obligations under its lease with the United States of America").  But Genesis's permits were revoked "[p]ursuant to § 105.6 of the Howard County Building Code," not Section 1-102(b), and indeed Genesis argues

11

that Section 1-102(b) "makes no allowance for revoking already-issued permits." Am. Compl. ¶ 88. Therefore, any "as-applied challenge" to the state statute "is not fit for judicial resolution," and the Court should decline to address it. *See Lynchburg Republican City Comm. v. Va. Dep't of Elections*, 793 F. Supp. 3d 765, 775 (W.D. Va. 2025).

**A.    The sole action challenged by Genesis—revocation of its building permits—was done pursuant to the Howard County Building Code, not Section 1-102(b).**

Genesis brought this lawsuit to challenge "Howard County's revocation of [its] [Building] Permits," which Genesis contends "violate[d] the Supremacy and Contract Clauses of the United States Constitution and 42 U.S.C. § 1983." Am. Compl. ¶¶ 16–17. Howard County expressly revoked Genesis's permits "[p]ursant to § 105.6 of the Howard County Building Code," Revocation Letter, meaning that the subject of Genesis's constitutional challenge is Howard County's application of its Building Code, not Section 1-102(b). Although Howard County justified its decision to revoke the permits on the basis of Section 1-102(b), the state statute did not compel the only action Genesis has challenged in this case.

Section 1-102(b) mandates procedures for the issuance of permits but is silent regarding their revocation. The section reads in its entirety:

> The State, a unit of local government, a county sheriff, or an agency, officer, employee, or agent of the State or a unit of local government may not approve a zoning variance or issue a permit for the construction of a building or the reuse of existing buildings or structures by any private entity for use as an immigration detention facility unless the governmental entity:
>
> (1) provides notice to the public of the proposed zoning variance or permit action at least 180 days before authorizing the variance or issuing the permit; and
>
> (2) solicits and hears public comments on the proposed zoning variance or permit action in at least two separate meetings open to the public.

If Section 1-102(b) applies to Genesis's facility—as the State believes it does[4]—then the statute requires that Howard County "provide[ ] notice to the public of the proposed . . . permit action at least 180 days before . . . issuing the permit," and that it "solicit[ ] and hear[ ] public comments." But Section 1-102(b) does not address what should happen if a County improperly issues permits without offering notice and an opportunity to comment.  Here, Howard County chose to revoke the permits under its Building Code, but if Section 1-102(b) does not require revocation, then Genesis's quarrel is with Howard County's application of its Building Code, not the state statute.

As a matter of statutory interpretation, Section 1-102(b) did not compel Howard County to revoke Genesis's permits.  "[B]egin[ing], as always, with the text of the statute," *Assateague Coastal Tr. v. Schwalbach*, 448 Md. 112, 127, 136 A.3d 866, 874 (2016), Section 1-102(b) is

---

[4] The parties dispute whether Section 1-102(b) applies to an immigration detention facility that is constructed and owned by a private entity for the purpose of being leased to, and operated by, the federal government.  The State does not believe the validity of Section 1-102(b) turns on that question, because any challenge to the statute is unripe and—as discussed below—the statute is constitutional as applied to the Elkridge property in any event.  *See United States v. Town of Windsor, Conn.*, 496 F. Supp. 581, 589 n.8 (D. Conn. 1980) ("It is unnecessary in the context of this federal declaratory judgment action for the Court to reach a decision which completely outlines the manner by which the [state] law . . . imposes the legal incidence of the various building regulations and the building permit fee, in view of the Court's holding which declares what the federal law is.").  But to the extent the Court concludes that the scope of Section 1-102(b) is ambiguous and that its constitutionality depends on whether it applies when an immigration detention facility is constructed and owned by a private entity for the purpose of being leased to, and operated by, the federal government, the Court should seek a dispositive interpretation of the statute from the Maryland Supreme Court.  *See* Md. Code Ann., Cts. & Jud. Proc. § 12-603 (Supreme Court of Maryland may answer certified questions "if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State"); *Trumbull Ins. Co. v. Int'l Mktg. Grp.*, No. 21-CV-2855-ABA, 2024 WL 4753369, at *4 (D. Md. Nov. 12, 2024) ("Certification of a question of state law to the state's highest tribunal is 'appropriate' when a federal court is 'required to address a novel issue of local law which is determinative in the case.'") (quoting *Gardner v. Ally Fin.*, 488 F. App'x 709, 712–13 (4th Cir. 2012)).  Although the State agrees with Howard County that the statute applies to the Elkridge facility, *see* Defs.' Mot. to Dismiss 13–14, certification will enable the parties to fully brief that state-law question before a court capable of providing "authoritative answers." *Arizonans for Official Eng. v. Arizona*, 520 U.S. 43, 77 (1997).

13

completely silent on the subject.  Other Maryland laws expressly allow revocation of permits, however, *e.g.*, Md. Code, Alcoholic Beverages § 3-601 ("The Executive Director [of the Alcohol, Tobacco, and Cannabis Commission] may revoke or suspend a license or permit . . . ."); Md. Code, Public Safety § 5-310(b) ("The Secretary [of State Police] may revoke a permit . . . ."), so had the General Assembly intended Section 1-102(b) to compel revocation, "the Legislature knew how to say so explicitly." *Cf. Md. Auto. Ins. Fund v. Baxter*, 186 Md. App. 147, 166, 973 A.2d 243, 254 (2009).  "That it chose different language . . . is indicative of a different intent." *In re Isely*, 489 Md. 374, 403, 330 A.3d 682, 699 (2025).  Furthermore, while Maryland courts may "consider legislative history" "when a statute is silent as to a particular issue," *Amaya v. DGS Constr.*, 479 Md. 515, 559, 278 A.3d 1216, 1242 (2022) (quoting *In re J.J.*, 456 Md. 428, 449, 174 A.3d 372, 384 (2017)), Section 1-102(b)'s legislative history does not address revocation, either.  In short, nothing in the statute's text or history "evince[s] an intent by the General Assembly" to require local governments to revoke permits that were issued in violation of the statute.  *Cf. id.*

Section 1-102(b) does not necessarily require revocation because, under Maryland law, invalid permits give their recipients "no property or other vested right[s]," and their issuance "d[oes] not estop" a local government from attempting to restrain activities authorized by the permit. *See Madison v. Reichelt*, 158 F. Supp. 401, 403–04 (D. Md. 1958) (citing *Lipsitz v. Parr*, 164 Md. 222, 227, 164 A. 743, 745 (1933)); *aff'd*, 267 F.2d 942 (4th Cir. 1959) (per curiam); *Little v. Mayor & City Council of Ocean City*, No. CV ELH-18-360, 2019 WL 4689238, at *26 (D. Md. Sept. 26, 2019) ("[A]n invalid building permit does not confer property rights.").  Thus, the State or a local government could sue to enjoin a builder from constructing a detention facility in reliance on a permit that had been issued in violation of Section 1-102(b).  *See Town of Berwyn Heights v. Rogers*, 228 Md. 271, 273–74, 179 A.2d 712, 713 (1962) (because defendants' "permits . . . were

14

in violation of the zoning ordinance" and "unlawful," municipality was "not estopped" to "place[ ] a stop work order on further construction"). The builder could raise the validity of the permit as a defense and potentially argue that Section 1-102(b) was federally preempted. That did not occur here and might never have occurred—Howard County might instead have offered notice and an opportunity to comment and belatedly validated the permit—which further underscores that any challenge to Section 1-102(b) is not ripe. *See Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 188 (4th Cir. 2007) ("An issue is not fit for review if 'it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'") (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

## B. Because Section 1-102(b) was never applied against Genesis, the factual record cannot show the statute is unconstitutional as applied in this case.

Genesis has brought an as-applied challenge that must be "based on a developed factual record and the application of a statute to a specific person." *Educ. Media Co. at Va. Tech v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc)); *see also* Mot. Hr'g Tr. 73:19–21 ("[W]e're not challenging 1-102 generically or facially . . . . It's an as-applied challenge."). Here, Howard County never began notice-and-comment procedures under Section 1-102(b), so the factual record cannot suffice to demonstrate that those procedures would be unconstitutional as applied to Genesis.[5] For that reason as well, Genesis's challenge is unripe. *See NetChoice v. Bonta*, 790 F.

---

[5] Any delay in initiating notice and comment is not itself unconstitutional because Genesis had remedies available in state court, *see Md. Comm'n on Hum. Rels. v. Downey Commc'ns*, 110 Md. App. 493, 536, 678 A.2d 55, 76–77 (1996) ("[I]f the agency fails to act within an appropriate time, the party adversely affected may be entitled to pursue an action for mandamus"), which it did not pursue. *Rockville Cars v. City of Rockville*, 891 F.3d 141, 148–49 (4th Cir. 2018) ("[N]o [42 U.S.C.] § 1983 procedural due process violation exists when a party fails to exhaust both administrative and state court remedies that the government affords to them").

15

Supp. 3d 798, 804 (N.D. Cal. 2025) ("[T]he mere existence of a statute is insufficient to create a ripe controversy[.]") (quoting *Project Veritas v. Schmidt*, 125 F.4th 929, 941 (9th Cir. 2025)).

Both Genesis and the United States speculate that Section 1-102(b)'s notice-and-comment requirement might delay completion of the Elkridge facility, Pl.'s Suppl. to Mot. for Prelim. Inj. 7; Second Statement of Interest by the United States 2, ECF 51 (June 12, 2026), but nothing in the record indicates that notice and an opportunity to comment could not have been provided before the project was scheduled for completion. Genesis applied for one permit in September 2024 and received it in August 2025, Ex. C to Pl.'s Mot. for Prelim. Inj.; it applied for another in November 2024 and received it in February 2025, Ex. B to Pl.'s Mot. for Prelim. Inj. Nothing suggests that a six-month notice-and-comment period could not have been conducted during that eleven-month process, or that even now any delay would be so significant that it would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *PG&E*, 461 U.S. at 203 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *cf. City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 200 (2003) (Scalia, J., concurring) ("Freedom from delay in receiving a building permit is not among th[e] 'fundamental liberty interests.'").

The Supreme Court has cautioned that courts "should not stretch to reach an early, and perhaps premature, decision respecting" a state statute's constitutionality in a context where it is not squarely implicated. *See PG&E*, 461 U.S. at 203 (holding that "[q]uestions concerning the constitutionality of" a California statute were "not ripe for review"); *see also Arizonans for Official Eng. v. Arizona*, 520 U.S. 43, 79 (1997) ("Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a state's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court."). That is particularly true in "cases

16

involving questions of state and local land use and zoning law," where federal courts should be hesitant to "leave their indelible print" by "sitting as a zoning board of appeals." *MLC Auto. v. Town of S. Pines*, 532 F.3d 269, 282 (4th Cir. 2008) (quoting *Pomponio v. Fauquier County Bd. of Supervisors*, 21 F.3d 1319, 1327 (4th Cir. 1994) (en banc), *overruled in part on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728–31 (1996)); *see also Pomponio*, 21 F.3d at 1327 ("[S]tate and local zoning and land use law is particularly the province of the State and [ ] federal courts should be wary of intervening in that area in the ordinary case.").

Here, Genesis did not challenge the constitutionality of Section 1-102(b) in its original complaint, has not named the State of Maryland as a defendant, and insisted at the hearing that it "d[id]n't have a controversy with the state of Maryland." Mot. Hr'g Tr. 73:14–15 (May 14, 2026). Notwithstanding Genesis's periodic feints in the direction of Section 1-102(b), *e.g.*, Pl.'s Suppl. to Mot. for Prelim. Inj. 1 ("To the extent that the County was seeking to enforce Maryland Correctional Code Section 1-102(b) through its permit revocations, that attempted application of the State law violates the Supremacy Clause . . . ."), this Court should take Genesis at its word. Genesis has brought an as-applied constitutional challenge to Howard County's application of section 105.6 of the Howard County Building Code. The constitutionality of Section 1-102(b) is not implicated, and this Court need not address it.

## II.    If The Court Reaches the Constitutional Question, Section 1-102(b) Is Constitutional.

To the extent this Court finds it necessary to reach the constitutional question, it should find that Section 1-102(b) is constitutional should it be applied to the Elkridge property. In particular, the statute does not impermissibly regulate the federal government because the federal government voluntarily required Genesis to comply with all applicable state and local permitting

17

obligations. Likewise, Genesis has not shown that a similar non-immigration detention facility would receive more favorable treatment; indeed, there are no valid comparators to civil immigration hold rooms under state law. Nor does Section 1-102(b) obstruct federal operations because the statute's six-month notice-and-comment requirement is procedural, not outcome-determinative, and relevant permitting and construction processes for such projects will likely exceed six months in the typical case.

### A. Section 1-102(b) does not violate the intergovernmental immunity doctrine.

"In our constitutional scheme, 'the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause.'" *McHenry County v. Raoul*, 44 F.4th 581, 585 (7th Cir. 2022) (quoting *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)). "The States have 'substantial sovereign authority' under this arrangement." *McHenry County*, 44 F.4th at 585 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). "This federalist structure of joint sovereigns preserves to the people numerous advantages[,]" including "assur[ing] a decentralized government that will be more sensitive to the diverse needs of a heterogenous society[.]" *Gregory*, 501 U.S. at 458.

The Supremacy Clause "generally immunizes the Federal Government from state laws that directly regulate or discriminate against it." *United States v. Washington*, 596 U.S. 832, 835 (2022). The intergovernmental immunity doctrine "prohibits state laws that *either* regulate the United States directly *or* discriminate against the Federal Government or those with whom it deals (*e.g.*, contractors)." *Id.* at 838 (alterations and internal quotation marks omitted); *see also Geo Grp. v. Inslee*, 151 F.4th 1107, 1116 (9th Cir. 2025) ("[I]ntergovernmental immunity attaches *only* to state laws that discriminate against the federal government and burden it in some way.")

18

(alteration in original) (emphasis added) (quoting *United States v. California*, 921 F.3d 865, 880 (9th Cir. 2019)).

###### 1.  Section 1-102(b) does not directly regulate the federal government.

A state law directly regulates the United States "when it 'places [either] a prohibition' or mandate on the federal government." *CoreCivic, Inc. v. Gov'r of New Jersey*, 145 F.4th 315, 321 (3d Cir. 2025) (alteration in original) (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)). Although the Supremacy Clause "does not bar all state regulation which may touch the activities of the Federal Government," it "does draw a line at those that place a prohibition on the Federal Government." *CoreCivic, Inc.*, 145 F.4th at 324 (alterations and internal citations omitted).

Genesis does not argue that Section 1-102(b) "place[s] a prohibition on the Federal Government." *See id.* It does not contend that Section 1-102(b) requires it to obtain a local permit or even forbids it from obtaining the permit it needs to satisfy its lease. *See* Lease No. GS-03PLMD00795, Ex. F, ¶ 14, at 69 (GSAR 552.270-8). Instead, Genesis argues principally that Section 1-102(b) makes obtaining a permit more time-consuming. Genesis asserts that Section 1-102(b)'s "indefinite, at least 180-day penalty lap" impermissibly interferes with federal functions, *see* Pl.'s Suppl. to Mot. for Prelim. Inj. 8, but it identifies no legal authority for the proposition that state-imposed delays on a private contractor who is contractually bound to comply with state law violate intergovernmental-immunity principles. The cases on which Genesis relies provide no such support. *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315 (3d Cir. 2025), and *Geo Group, Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022) (en banc)—heavily cited by Genesis—both involved state laws that prohibited private detention facilities entirely. By contrast, Section 1-102(b) does not prohibit any immigration detention facilities; it simply requires notice and an opportunity for comment. Any delay in providing a building permit—one that Genesis insists, as

19

a federal contractor, it is not even legally required to obtain[6]—does not constitute "direct control by the state over federal government operations" in a manner that would violate the U.S. Constitution. *See Nwauzor v. GEO Grp.*, 127 F.4th 750, 762 (9th Cir. 2025).[7] Thus, if applied to the Elkridge property, Section 1-102(b) would not implicate direct regulation concerns. *See id.* at 761–63.

2.  Section 1-102(b) does not discriminate against the federal government.

Genesis contends that Howard County's interpretation of Section 1-102(b) impermissibly targets the federal government, which is "the only entity in the business" of buying private immigration detention. *See* Pl.'s Suppl. to Mot. for Prelim. Inj. 13 (citation omitted). But Genesis has not carried its burden to demonstrate that any comparable non-immigration detention facility receives more favorable permitting-processing treatment. Nor could it, because a hold room for civil detention purposes lacks a proper state-law comparator.

A state law "discriminates against the Federal Government or its contractors" if the state law (1) "singles them out for less favorable treatment," or (2) "regulates them unfavorably on some

---

[6] Genesis argues that "permits are not *required* for the Elkridge property because it is being renovated for the federal Government, which is likely immune from state and local construction permitting requirements." Mem. in Further Supp. of Mot. for Prelim. Inj. and in Opp'n to Defs.' Mot. to Dismiss 6 n.5, ECF 29 (Apr. 10, 2026).

[7] In response to the Court's request for supporting authority, Genesis repeatedly cited *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956). *See* Mot. Hr'g Tr. 23:2–22:22, as well as *Public Utilities Commission v. United States*, 355 U.S. 534 (1958)); *see also* Pl.'s Supp. to Mot. for Prelim. Inj. 7. But those cases concerned state laws requiring federal contractors to obtain specific licenses or permits, which Section 1-102(b) does not. *See Nwauzor*, 127 F.4th at 762 (distinguishing licensing and permitting regimes in *Leslie Miller* and *Public Utilities Comm'n* from Washington's minimum wage law as applied to an immigration detention facility). Neither *Leslie Miller* nor *Public Utilities Commission* addressed state laws that merely affect the time it takes to issue a permit. In any event, as discussed above, Section 1-102(b) does not necessarily even require a contractor to wait longer to obtain a building permit. *Leslie Miller* and *Public Utilities Commission* do not support the proposition that Section 1-102(b) impermissibly regulates the federal government.

basis related to their governmental status." *United States v. Washington*, 596 U.S. at 839 (alterations and internal citations omitted). A law discriminates where "it treats comparable classes of federal and state employees differently, advantaging the state employees," and "no significant differences between the two classes justify the differential treatment." *United States v. Illinois*, 796 F. Supp. 3d 494, 533 (N.D. Ill. 2025) (quoting *Nwauzor*, 127 F.4th at 763 and then *Dawson v. Steager*, 586 U.S. 171, 175 (2019)). In short, a state "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544–45 (1983); *see also North Dakota v. United States*, 495 U.S. 423, 438 (1990) (plurality opinion) (framing discrimination inquiry as whether burden is "imposed equally on other similarly situated constituents"); *Geo Grp.*, 151 F.4th at 1118 ("A state law or regulation impermissibly discriminates against the federal government if it treats a state entity more favorably than it treats a comparable federal entity.") (citing *Dawson*, 586 U.S. at 175–76).

Genesis has not met its burden, at this preliminary injunction stage, to identify a comparable type of non-immigration detention facility that would be subject to an easier permitting process. *See McHenry County*, 44 F.4th at 594 ("[T]he Counties cannot identify any actors 'similarly situated' to the federal government that receive more favorable treatment under the Act. The mere fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination."); *United States v. New York*, 810 F. Supp. 3d 329, 353 (N.D.N.Y. 2025) ("The challenged policies certainly affect the federal government as the primary enforcer of civil immigration law. . . . But the United States never identifies a comparator."). Though Genesis argues, in passing, that "other building project[s], including other I-3 detention facilities that are not for immigration," are not subject to a notice-and-comment period, *see* Pl.'s Supp. to Mot. for

21

Prelim. Inj. 9; *see also* Second Statement of Interest of the United States 7 ("By making the process to obtain a permit for a federal civil immigration detention facility more onerous than the process to obtain a permit for detention facilities for other purposes."), such conclusory statements do not meet the moment. *See Immigr. Legal Res. Ctr.  v. City of McFarland*, 478 F. Supp. 3d 988, 999–1002 (E.D. Cal. 2020) ("The record before the Court is too incomplete at this time to determine whether [the California law] discriminates against the federal government. . . . Looking at the 'broader regulatory context,' it is unclear whether there is a similarly situated state contractor that would be treated better than GEO."), *vacated and remanded on other grounds*, 827 F. App'x 749 (9th Cir. 2020) (per curiam).  Genesis does not explain why other I-3 detention facilities under State law are comparable to immigration hold rooms.[8]  Nor could it.  A hold room does not have a proper comparator under State law.

 First, hold rooms are used to detain individuals accused of civil violations, not criminal ones.  *See* Second Statement of Interest of the United States 7 (referring to the "[d]etention of individuals for violations of federal *civil* immigration law") (emphasis added); *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (immigration proceedings are "civil, not criminal," and intended to be "nonpunitive in purpose and effect").  Thus, state and local I-3 detention facilities for those charged with or convicted of crimes are not analogous.  *See, e.g.*, *Geo Grp.*, 151 F.4th at 1120 (concluding

---

[8] The International Building Code defines Institutional Group I-3 to include "buildings and structures that are inhabited by more than five persons who are under restraint or security . . . who are generally *incapable of self-preservation* due to security measures not under the occupants' control" and states the group "shall include, but not be limited to, the following: [c]orrectional centers[,] [d]etention centers[,] [j]ails, [p]rerelease centers[,] [p]risons[,] [and] [r]eformatories." International  Building  Code  (2021),  § 308.4 (emphasis in original), available here: https://codes.iccsafe.org/content/IBC2021P2/chapter-3-occupancy-classification-and-use#IBC2021P2_Ch03_Sec308            [https://perma.cc/8WHF-BT2K];            COMAR 09.12.51.04A(1) (incorporating by reference the 2021 International Building Code).

that "[b]ecause of the fundamental differences between Washington's prisons, which are state-owned and state-operated facilities that hold and punish convicted criminals, and . . . a privately owned and privately operated detention facility that holds civil detainees," "the appropriate comparator is not Washington's prisons."). Indeed, "[i]t is doubtful that a comparator exists, for [Genesis] concedes that only the federal government enforces civil immigration law."[9] *See United States v. Illinois*, 796 F. Supp. 3d at 534.

Second, unlike other state civil detention facilities (such as hospitals used for involuntary commitments), hold rooms are often located *inside* office buildings, which themselves may be located in residential or business districts, raising unique considerations about health and human safety.[10] According to Genesis, "more than 96% of the Elkridge property is to consist of office space." Hartsell Decl. ¶ 8. The holding cells will comprise "less than 1,100 square feet," with what appears to be a single shower and "no beds." *Id.* Indeed, the unique nature of hold rooms is apparent from the parties' disagreement over whether the Elkridge property should be classified as a commercial building or a detention facility. *See id.* ¶¶ 13–14.

---

[9] Even within the civil immigration-detention system, hold rooms constitute a distinct category, as demonstrated by the fact that these facilities are governed by different standards than long-term immigration detention facilities. *See D.N.N.*, 822 F. Supp. 3d at 560 (explaining that DHS and ICE operate civil detention facilities nationwide, most of which are governed by ICE's Performance-Based National Detention Standards," but that these standards "do not apply to holding cells") (internal quotation marks omitted).

[10] Although the federal request for lease proposals for this project states that the proposed building "cannot be near residential, religious, educational or retail facilities," *see* Request for Lease Proposals 2, the Elkridge property "sits in an existing office park . . . in close proximity to healthcare providers, schools, parks, and neighborhoods" and is "within a one-mile radius" of several community destinations, including an elementary and a middle school, *see* Press Release, Howard County Executive Calvin Ball Announces the County Has Revoked the Building Permit for Privately-Owned Detention Center (Feb. 2, 2026), https://www.howardcountymd.gov/News020226b [https://perma.cc/G4SA-2PGT].

Given that the federal government recently was found to have subjected detainees to unconstitutionally overcrowded conditions in the (comparatively spacious) hold rooms in the George H. Fallon Federal Building in Baltimore, *see D.N.N.*, 822 F. Supp. 3d at 591 (finding that detainees held in rooms totaling approximately 1,700 square feet were likely to show a "sufficiently serious" "deprivation of hygienic, sanitary, and safe conditions"), it is plainly reasonable for the State to be concerned about the health and safety impacts of detention space located in office buildings. *See also, e.g.*, *Pablo Sequen v. Albarran*, 810 F. Supp. 3d 1084, 1100, 1131 (N.D. Cal. 2025) (holding that provisionally certified plaintiff class was likely to succeed in showing that conditions of confinement in "hold rooms" at ICE's San Francisco field office were likely punitive and likely violated the Due Process Clause); Mem. Op., *Barco Mercado v. Noem*, No. 1:25-cv 06568-LAK, ECF 96, at 4, 8–9 (Sept. 17, 2025) (holding that plaintiff class was very likely to succeed in showing that conditions of confinement in "hold rooms" on the tenth floor of ICE's New York regional office violated the First and Fifth Amendments).[11]

In sum, Section 1-102(b) as applied to the Elkridge property would not run afoul of the intergovernmental immunity doctrine. The statute does not directly regulate the federal government because it does not prohibit any immigration detention facilities and, in any case, the federal government has voluntarily subjected Genesis to state and local permitting requirements.

---

[11] Genesis also relies on statements from the Howard County Council suggesting that the County revoked the permits because the Elkridge property would be used for immigration detention. *See* Pl.'s Supp. to Mot. to Prelim. Inj. 9. But the statements from the Howard County Council are irrelevant to the constitutionality of the state statute. In any event, "[a]nalysis of an allegedly discriminatory [law] must proceed from the text of the [law], not the alleged motives behind it." *See Geo Grp. v. City of Tacoma*, No. 3:18-CV-05233-RBL, 2019 WL 5963112, at *4 (W.D. Wash. Nov. 13, 2019) (internal quotation marks omitted).

Nor does it discriminate against the federal government in requiring certain procedures before permits are authorized for hold rooms.

### B.    Section 1-102(b) is not preempted.

Genesis wrongly contends that Section 1-102(b) is preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," i.e., to enforce immigration law, select "appropriate places" for immigration detention, and lease property for that purpose. *See* Pl.'s Suppl. to Mot. to Prelim. Inj. 9 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)); *see also* Am. Compl. ¶¶ 107–08, 111–13. Genesis speculates that the statute's "practical effect" will be to deter federal agencies from leasing detainee-processing facilities from private contractors and "forc[e]" them to build or purchase new facilities, but it offers no concrete support for that claim. *See* Pl.'s Suppl. to Mot. to Prelim. Inj. 10. But given the "presumption against preemption" "when Congress legislates [in] a field traditionally occupied by the states," *N. Va. Hemp & Agric. v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025)—such as "[l]and use planning," *Bryant Woods Inn v. Howard County*, 124 F.3d 597, 603 (4th Cir. 1997)—Genesis's self-interested speculation cannot suffice to preempt Section 1-102(b). *See Cap. Associated Indus. v. Stein*, 922 F.3d 198, 204 (4th Cir. 2019) (an "as-applied challenge[ ] . . . test[s] the constitutionality of a statute applied to the plaintiff based on the record"). The statute merely imposes a procedural step unlikely to delay the permitting process—one to which the federal government consented when it required Genesis to "obtain all necessary permits" and "comply with all . . . state . . . laws" as conditions of its lease. Lease No. GS-03PLMD00795, Ex. F, ¶ 14, at 69 (GSAR 552.270-8).

Federal law can preempt state law in three ways: express preemption, conflict preemption, and field preemption. *See Murphy v. NCAA*, 584 U.S. 453, 477 (2018). Genesis here invokes

25

"[o]bstacle preemption, a subset of conflict preemption," which "occurs 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *See Just Puppies v. Frosh*, 565 F. Supp. 3d 665, 709 (D. Md. 2021) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)) (internal quotation marks omitted). "The federal government's advantage under the Supremacy Clause is 'an extraordinary power in a federalist system,' and it is 'a power that we must assume Congress does not exercise lightly.'" *McHenry County*, 44 F.4th at 587 (quoting *Gregory*, 501 U.S. at 460)). Thus, "[p]articularly where a statute regulates a field traditionally occupied by states, such as health, safety, and land use, a 'presumption against preemption' adheres," *Atay v. County of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)), and "[c]ourts find that state laws pose an obstacle only where 'applying the state law would do major damage to clear and substantial federal interests,'" *United States v. Illinois*, 796 F. Supp. 3d at 525 (quoting *C.Y. Wholesale v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020)).

To start, "[n]othing in [Section 1-102(b)] frustrates the federal government's ability to detain individuals at" the facility of its choosing. *See Geo Grp.*, 151 F.4th at 1123. "Nor do[es] [Section 1-102(b)] prevent [Genesis] from accomplishing any task that has been required by the federal government—especially when its own contract with ICE contemplates more stringent state requirements in the first place." *See id.* at 1123–24. Here, the six-month notice-and-comment requirement does not prescribe any specific outcome, and it does not impose any mandates on the private contractor or the federal government. The statute merely requires that a local government notify the public of a proposed plan to construct an immigration detention facility and provide the public with the opportunity to comment at public hearings before issuing a construction or renovation permit.

26

As discussed above, hold rooms are often located in office buildings, which may affect nearby communities more directly than other detention facilities.  At a public hearing on Howard County's proposed emergency legislation, residents expressed concerns about plans for an immigration detention facility at the Elkridge property.  *See* Lillian Reed, *Hundreds pack hearing on Howard County proposal to ban immigrant detention facilities*, Balt. Banner (Feb. 4, 2026), https://www.thebanner.com/politics-power/national-politics/howard-county-ice-detention-facility-ban-TCI4JVZYFJC3NBKO542XF6TMFQ/ [https://perma.cc/DX5L-GDP3] (quoting  a councilmember describing Elkridge property as a "detention center in an office park"); April Santana, *Howard's ban on ICE jails heads to vote tonight, likely with an amendment*, Baltimore Sun (Feb. 4, 2026), https://www.baltimoresun.com/2026/02/04/howard-county-community-ice-facility-elkridge/  [https://perma.cc/9U7N-V32J] (quoting an Elkridge resident living within a one-mile radius of the Elkridge property and a faith-based nonprofit leader raising concerns proposed detention facility).  Holding public hearings that allow community members to express their views about a proposed immigration detention facility does not, by itself, "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[12]  *See PG&E*, 461 U.S. at 203 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

---

[12] Indeed, the federal government or its private contractor may choose to modify their immigration-detention plans in response to such public comments.  Nor does anything prevent a local permitting authority from considering information obtained through public comment in the ordinary course of reviewing permit applications.  In short, public hearings can serve an important fact-finding role.  As noted above, public reporting shows that the federal government has already repeatedly cancelled proposed immigration detention facilities in the face of community feedback.  It is therefore entirely possible that the federal government will ultimately choose to use the Elkridge property solely for administrative office space—particularly given that 96% of the building was already designated for that purpose—or will otherwise address public concerns about the proposed detention facility.

Moreover, because the permitting and construction process for an immigration-detention facility is likely to take more than six months, Section 1-102(b) is unlikely to cause any actual delay in a project's completion. Here, Genesis did not obtain its first construction permit until February 2025—one year and nine months after it entered into the federal lease agreement—and, indeed, its initial permit application was not submitted to DILP until nearly eighteen months after executing the lease. Even assuming the permitting process began on January 31, 2025, when GSA purportedly issued a Construction Notice to Proceed, *see* Statement of Interest of the United States 3, Genesis did not obtain its second building permit until August 5, 2025—*more* than six months later. Regarding construction, even assuming Genesis completed its work by December 29, 2025, the Elkridge property would not have been ready for federal occupancy until almost seventeen months after the proposed lease-commencement date. *See* Request for Lease Proposals 1 (listing commencement as on or about August 1, 2024, or upon acceptance of the space). Thus, even if Howard County had provided six-months' notice and an opportunity for public comment before issuing Genesis a permit, that additional procedural step is unlikely to have obstructed—or even delayed—the federal government's ability to occupy and use the Elkridge property.

Finally, it bears emphasizing that the federal government consented to the requirement that Genesis obtain a local permit and required Genesis to comply with state law. *Cf. W. Star Hosp. Auth. v. City of Richmond*, 986 F.3d 354, 361 (4th Cir. 2021) ("Where, as here, a federal agency, of its own volition, imposes a contract condition consistent with federal law, the Supremacy Clause is not implicated."). The federal government's lease with Genesis requires that Genesis "obtain all necessary permits" and "comply with all . . . state . . . laws." Lease No. GS-03PLMD00795, Ex. F, ¶ 14, at 69 (GSAR 552.270-8). Not only do those terms "not forbid [Genesis] to comply with" the state statute, "the plain language of the contract requires quite the

28

opposite." *See Nwauzor*, 127 F.4th at 770. Section 1-102(b) can hardly impose an obstacle to federal objectives when the federal government's contract with Genesis "explicitly requires [Genesis] to comply with 'state [ ] laws.'" *See id.* at 762. "[C]ourts should not seek out conflicts where none clearly exist," *N. Va. Hemp & Agric.*, 125 F.4th at 493, and given the requirements of Genesis's lease, there is no conflict here.

## CONCLUSION

The Court should decline to address the constitutionality of Section 1-102(b) as applied to the Elkridge property because that issue is not ripe. If the Court nevertheless considers the issue, it should find that Section 1-102(b) is constitutional should it be applied to the Elkridge property, as it neither regulates nor discriminates against the federal government and is not preempted.

Dated: June 25, 2026

Respectfully submitted,

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

*/s/ Yasmin Dagne*

Yasmin Dagne (D. Md. Bar No. 32016)
Keith M. Jamieson (D. Md. Bar No. 31543)
Adam Kirschner (D. Md. Bar No. 31767)
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
ydagne@oag.maryland.gov
410-223-1580

*Counsel for the State of Maryland*

29