## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GENESIS GSA STRATEGIC ONE, LLC,

    *Plaintiff,*

v.

HOWARD COUNTY, *et al.*,

    *Defendants.*

Case No. 26-cv-915

## MEMORANDUM OPINION

In 2022, the federal government decided to replace certain facilities used by the Department of Homeland Security ("DHS") for immigration enforcement work in Maryland, in part in response to concerns about the conditions of temporary holding rooms at the current facility in Baltimore that have been the subject of litigation since then. *See, e.g., D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 590–97 (D. Md. Mar. 6, 2026); *State of Maryland v. Lyons, et al.*, Case No. 26-cv-1024-JRR, ECF No. 1. The government selected Genesis GSA Strategic One, LLC ("Genesis") as the contractor for the project. Genesis agreed to purchase and renovate a building at 6522 Meadowridge Road in Elkridge, Maryland in Howard County ("the Elkridge Property") for that purpose, and then to lease it to the federal government. The government directed that the vast bulk of the facility be for office space for DHS employees; the plan also includes 1,100 square feet for temporary holding cells and a detainee shower. Genesis undertook the lengthy design, permitting, and construction process. Howard County issued Genesis a commercial alteration permit in February 2025 (and another in August 2025), and Genesis began construction per the federal government's specifications.

On February 2, 2026, when construction was nearly complete, Howard County revoked Genesis's construction permits. The County's stated basis was that issuance of the permits had been erroneous and premature, because a Maryland statute prohibits local governments from "issu[ing] a permit for the construction of a building or the reuse of existing buildings or structures by any private entity for use as an immigration detention facility" without first providing public notice and completing a public comment period. Md. Code Ann., Corr. Servs. § 1-102(b). Although it is undisputed that the Elkridge Property was never going to operate as a privately-run facility and instead all along has been planned to be operated directly by the federal government (unlike some private immigration detention facilities in other states), the County contends that the statute still requires a notice and comment period before it can issue (or re-issue) construction permits for the Elkridge Property. Despite the County's position that § 1-102(b) applies to the Elkridge Property (a position Genesis disputes), the County still has not begun any such notice and comment period.

After the County revoked the permits, Genesis filed this case, contending that the revocation of the permits violated the Supremacy Clause and Contract Clause of the U.S. Constitution and 42 U.S.C. § 1983. Defendants (Howard County and various county officials sued in their official capacities only, referred to herein as "Defendants" or "the County") filed a motion to dismiss, and Genesis filed a motion for a preliminary injunction. The federal government filed two statements of interest, and the State of Maryland filed briefing supporting the constitutionality of § 1-102. For the reasons that follow, some of Genesis's claims will be dismissed. But because Genesis has shown that applying § 1-102(b) to this project violates the Supremacy Clause of the U.S.

Constitution, the Court will grant Genesis's request for a preliminary injunction reinstating the permits.

**Table of Contents**

I.    Background ...................................................................................................4

    A.  Permit Issuance...............................................................................4

    B.  Permit Revocation..........................................................................9

    C.  Council Bill 16-2026....................................................................... 12

    D.  Procedural History ........................................................................ 16

    E.  Claims .............................................................................................. 21

    F.  Motions and Requests....................................................................22

II.  Standards of Review .....................................................................................24

    A.  Motion for Preliminary Injunction ...............................................24

    B.  Motion to Dismiss .........................................................................24

III.Counts 2 and 3 fail to state claims on which relief can be granted............ 25

    A.  Contract Clause (Count 2)............................................................. 25

    B.  42 U.S.C. § 1983 (Count 3)............................................................30

IV. Supremacy Clause Claim (Count 1) .............................................................33

    A.  Section 1-102 applies to the Elkridge Property.............................34

    B.  Genesis's claims are ripe for review..............................................36

    C.  Facial vs. as-applied constitutionality ..........................................38

    D.  Genesis has shown a strong likelihood of success on the merits on its Supremacy Clause claim based on intergovernmental immunity........................ 41

        1.  Direct regulation.....................................................................42

        2.  Discrimination ........................................................................44

    E.  Remaining Preliminary Injunction Factors..................................52

        1.  Irreparable Harm.....................................................................52

        2.  Balance of Equities and Public Interest ..................................53

    F.  Bond ................................................................................................54

V.  Conclusion ....................................................................................................55

## I.       Background[1]

### A.       Permit Issuance

In 2022, during the Biden Administration, the General Services Administration ("GSA") issued a request-for-lease proposal and began soliciting bids for the federal government to lease a commercial office space within the Baltimore area for a 15-year term with a 5-year lease-extension option. ECF No. 16-2, Declaration of Lonnie Brand Hartsell ("Hartsell Decl."), ¶ 4. Genesis identified a "freestanding commercial building at 6522 Meadowridge Road in Elkridge, Maryland that was for sale" and that Genesis "determined . . . would be suitable for the requirements laid out in the Bid Solicitation." *Id*. ¶ 5. In response to the bid solicitation, on January 4, 2023, Genesis, a company that has constructed offices and facilities for the federal government for decades, submitted a bid identifying the Elkridge Property. *Id*. ¶¶ 3, 5, 9.

GSA awarded the contract to Genesis, and Genesis purchased the property. *Id*. ¶ 9. In May 2023 Genesis entered into a lease agreement with the federal government through GSA for the Elkridge Property. *Id*. ¶¶ 9–10; ECF No. 34. Under the terms of the

---

[1] For purposes of Defendants' motion to dismiss, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). For purposes of Genesis's motion for preliminary injunction, the Court does not assume the allegations are true but rather must decide whether Genesis has established a likelihood of success on the merits. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Here, the relevant facts are largely undisputed. Where disputes of fact become relevant to the analysis—such as disputes regarding whether the County was aware that ICE would be utilizing the Elkridge Property—the evidence presented by both sides is discussed and, where necessary for adjudicating the preliminary injunction motions, the facts as described are those the Court finds based on the evidence in the preliminary injunction record.

lease, "more than 96% of the Elkridge [P]roperty is to consist of office space and in less than 1,100 square feet will there be holding cells and a detainee shower." ECF No. 16-2, Hartsell Decl. ¶ 8. The lease provides that GSA intended the building to be utilized by Immigration and Customs Enforcement ("ICE") and that the holding cells would only be utilized for temporary detention with detainees transferred to other facilities prior to the facility closing at 6:00 p.m. each day. *Id.* ¶¶ 8, 22; ECF No. 34. The lease also requires Genesis to "comply with all Federal, state, tribal, and local laws applicable to its ownership and leasing of the property, including, without limitation, laws applicable to the construction, ownership, alteration or operation of all buildings, structures, and facilities located thereon, and obtain all necessary permits." ECF No. 34-1 at 67, ¶ 14.[2]

On or about September 27, 2024, Genesis applied to the Howard County Department of Inspections, Licenses and Permits for renovation construction permits. ECF No. 40 ¶ 35. On February 18, 2025, the County issued Genesis a commercial alteration permit (Permit No. B24004317) for the Elkridge Property for which the description of work states, "GENESIS GS[*sic*], STRATEGIC ONE LLC / IMPROVEMENT OF TENANT SPACE ONLY (RESTROOMS AND COMMON AREA). EXISTING BUILDING EGRESS AND FIRE RATINGS NOT CHANGED." *Id.* ¶ 38; ECF No. 1-1 at 15.[3] That permit covered all parts of the facility other than construction of the holding cell area. *See* ECF No. 16-2, Hartsell Decl. ¶ 15.

---

[2] Although the lease was filed under seal, Genesis and the federal government have jointly agreed that this provision can be unsealed. *See* ECF Nos. 59, 62, & 63 (the federal government confirmed on the record at the July 2 motions hearing).

[3] Citations to page numbers for case documents are to the page number provided in the ECF header, not the page number native to the document itself.

During the permit review process, Genesis and County officials openly discussed that a portion of the newly constructed facility was to include detention cells for use by federal law enforcement. *See id.* ¶¶ 12, 13, 16. There is no dispute that Howard County officials knew that GSA was securing the facility for federal law enforcement and that the facility was to include a portion for temporary detention. *See, e.g.*, ECF No. 1-1 at 2 (Commercial Alteration Permit including for "DETENTION FACILITY" and "DETAINEE PROCESSING"). So, after the February 2025 permit, the parties continued to discuss a permit for the rest of the facility. *See* ECF No. 16-2, Hartsell Decl. ¶ 16.

The fact that the building would be used for detention gave rise to a dispute about zoning classification, specifically whether the Elkridge Property should be classified for "I-3 use," which the Howard County Building Code defines to "include buildings and structures that are inhabited by more than five persons who are under restraint or security," including "Detention centers" and "Jails." Howard Cnty. Bldg. Code § 308.4; ECF No. 16-2, Hartsell Decl. ¶¶ 13–15, 17. The County deemed I-3 to be the correct designation, and on August 5, 2025, issued Genesis another commercial alteration permit (Permit No. B24003712) to encompass the areas not covered by the earlier permit: "IMPROVEMENT OF TENANT SPACES SUPPORT AREAS, DETENTION FACILITY, DETAINEE PROCESSING AND SECURED WAITING AREA." ECF No. 40 ¶¶ 38–39; ECF No. 1-1 at 2; *see* ECF No. 16-2, Hartsell Decl. ¶ 17.[4]

---

[4] Howard County issued several other permits to Genesis for the Elkridge Property, *see* ECF No 1-1, but the construction permits (Permit Nos. B24004317 and B24003712) are the ones most relevant to this case.

Although there is no dispute that Howard County approved the project knowing it was for federal law enforcement, including detention, there is a dispute about whether it was clear to Howard County officials that the holding cells would be for federal *immigration* detention as opposed to other federal law enforcement detention.

Genesis has submitted evidence that Howard County officials fully understood through the permitting process that ICE was the prospective tenant. For example, the building drawing submitted with the permit application—and that the County attached to the permit that was issued in August 2025—also included a room next to the detainee area called "FILE ROOM (ALIEN)," using the term that various federal statutes still use to refer to non-U.S. citizens. ECF No. 1-1 at 6. The reference to a room for "ALIEN" files is directly across the hall from the entrance to the "DETAINEE HOLDING" area, and directly next door to four rooms labeled "DETAINEE NON-CONTACT VISITOR BOOTH." *Id.* And it is two doors down from a room labeled "SUPER. DET. & DEPORT.," presumably referring to a supervisor for "detention and deportation." *Id.* The area down the hall includes ten additional offices labeled "SUPER. DET. & DEPORT." *Id.* at 5.

In addition to that documentary record, Genesis has submitted a declaration from its Managing Member, Lonnie Hartsell, that also describes a series of calls and meetings between Genesis and Howard County officials. ECF No. 16-2, Hartsell Decl. ¶¶ 13–17, 20–22. Hartsell in particular describes a Zoom call on April 10, 2025 that included Howard County's Chief of Plan Review, Donald Mock. *Id.* ¶ 21. Hartsell describes that meeting as including not only "the Genesis construction team" but also "ICE's Project Manager at the time—who was identified as such during the call." *Id.*

Hartsell states that during that video conference "the parties discussed temporary detention areas and the fact that there would be no overnight stays and that the hours of operation would be from 6:00 am to 6:00 pm." *Id.* Based on the documentary evidence and the Hartsell declaration, Genesis contends that "[a]t all relevant times prior to and following issuance of Permits, it was known to Howard County and personnel working on behalf of the County that the renovated Elkridge [P]roperty was going to be used by [ICE] personnel including, in part, as a temporary detainee processing facility." *Id.* ¶ 20; *see also* ECF No. 40 ¶¶ 36–37.

On the question of whether County officials knew that ICE was going to be the federal agency using the facility, the County has submitted a declaration from Mr. Mock. ECF No. 55-3, Affidavit by Donald Mock ("Mock Decl."). Mr. Mock states that he "do[es] not recall, if [he] ever knew, that personnel from [ICE] participated in the online meeting, which involved the Genesis side attending the meeting over a singular video image of their group of multiple individuals in a single location, rather than each person being individually on their own video feed." *Id.* ¶ 5. He further contends that "[i]f personnel from any client or tenant of Genesis was present, [he] either was not aware of it at the time or do[es] not recall." *Id.* ¶ 7.

The County also has submitted a declaration from Robert Frances, the Director of the Howard County Department of Inspections, Licenses and Permits and the person who approved issuance of the permits. ECF No. 55-2, Affidavit by Robert Frances ("Frances Decl."). Mr. Frances's declaration does not address the question of whether the County knew that ICE was the agency for which Genesis was constructing and GSA was leasing the Elkridge Property. Instead, Mr. Frances's declaration states that the

8

reason he approved the permits without completing the notice and comment period required by § 1-102(b) was that he was unaware of § 1-102 at the time of issuance. ECF No. 55-2, Frances Decl. ¶¶ 1, 4–5.

### B.      Permit Revocation

Nearly a year after Howard County issued the February 18, 2025 commercial alteration permit, and six months after the August 8, 2025 permit based on the I-3 designation, the County reversed course. On February 2, 2026, the Howard County Department of Inspections, Licenses and Permits issued a written notice to Genesis revoking Permit Number B24003712 followed by an email revoking Permit Number B24004317 (collectively, the "Revocation Letter"). ECF No. 40 ¶ 48. The Revocation Letter, signed by Director Frances, states that "[p]ursuant to The Annotated Code of Maryland — Correctional Services Code § 1-101 and § 1-102, Howard County has reason to believe that the facility under renovation at [the Elkridge Property] meets the definition of an 'immigration detention facility' as defined by State Code." ECF No. 1-2 at 2; ECF No. 40 ¶ 50.

In Director Frances's declaration, he states that when he approved issuance of the February and August 2025 permits to Genesis, he "did not know of the State requirement in the Correctional Services Article § 1-102(b)," at least in part because "[t]he Correctional Services Article is not part of what I normally review in the conduct of my Building Official duties." ECF No. 55-2, Frances Decl. ¶¶ 5–6. He explained what prompted the February 2026 revocation:

> The Correctional Services Article § 1-102(b) was brought to my attention in February 2026. Upon review of Correctional Services Article § 1-102(b), I determined that

I had exceeded my authority to issue permits B240004317 and B240003712 because the County had not issued notice to the public or heard public comment in at least two public meetings.

When I became aware of the State statute, I realized that I had not complied with a State limitation on the County's authority to issue building permits, which I am delegated as the Building Official to carry out. As the Building Official, I am responsible for issuing building permits within the statutory authority granted to the County. Because I had exceeded my authority in issuing permits B240004317 and B240003712, I am responsible for determining whether building permits must be revoked. Because of the limitation of authority in the Correctional Services Article § 1-102(b), the permits were invalid when issued and therefore I revoked them as invalidly issued.

*Id.* ¶¶ 7–8.[5]

Section 1-102(b)—the state law that the County contends required revocation of the Genesis permits—prohibits "a unit of local government . . . or an agency, officer, employee, or agent of . . . a unit of local government" from "issu[ing] a permit for the construction of a building or the reuse of existing buildings or structures *by any private entity for use as an immigration detention facility* unless the governmental entity: (1) provides notice to the public of the proposed . . . permit action at least 180 days before . . . issuing the permit; and (2) solicits and hears public comments on the proposed . . . permit action in at least two separate meetings open to the public." Md. Code Ann.,

---

[5] Under Howard County Building Code § 105.6, "[t]he building official is authorized to suspend or revoke a permit issued under the provisions of this code wherever the permit is issued in error or on the basis of incorrect, inaccurate or incomplete information, or in violation of any ordinance or regulation or any of the provisions of this code."

Corr. Servs. § 1-102(b) (emphasis added). "Immigration detention facility" is defined as "any building, facility, or structure used, in whole or in part, to house or detain individuals for federal civil immigration violations." Md. Code Ann., Corr. Servs. § 1-101(j).

As explained below, at no point was Genesis (or any other private entity) going to be operating the facility once it opens; unlike privately run immigration facilities in some states, Genesis's role under its lease agreement with the federal government is limited to acquiring, renovating and delivering the property—for the facility to then be run by the federal government. But the County here—joined by the State—contend that § 1-102(b) applies not only to an "immigration detention facility" that is *operated* by a "private entity," but also any facility that (a) includes immigration detention as one of its functions and (b) involved any private entity in the *construction* of the facility.

Based on that interpretation, the County revoked the permits it had previously issued to Genesis: the Revocation Letter states that § 1-102 required Howard County, before issuing Genesis the permits, to provide the public with notice at least 180 days prior to issuance and hold at least two public meetings to hear comments on the permit action. ECF No. 1-2. Moreover, as noted above, Howard County Building Code § 105.6 authorizes the suspension or revocation of permits "issued in error or on the basis of incorrect, inaccurate or incomplete information, or in violation of any ordinance or regulation or any of the provision of this code." *Id.* Because that notice-and-comment period had not happened for the Elkridge Property and based on the County's position that § 1-102(b) applied to the Elkridge Property, the County revoked Genesis's construction permits. *Id.*

As of February 2, 2026, the date of the Revocation Letter, Genesis contends (and no party disputes) that renovations were more than 90% complete and the Elkridge Property was scheduled to be turned over to the federal government in March 2026. ECF No. 16-2, Hartsell Decl. ¶ 24. It further contends that, as of the date it filed its complaint, "Genesis ha[d] spent in excess of $21,665,325.91" on the acquisition and renovations. *Id.* ¶ 30. Interest on the loans that Genesis obtained to acquire and renovate the Elkridge Property is accruing at a rate of approximately $5,000 per day. *Id.* ¶ 29. For every month the renovation is delayed, Genesis is unable to collect the $131,995.85 in monthly rent from the federal government pursuant to the lease. *Id.* ¶ 28. And Genesis states that its bankers have "told Genesis that they will not loan it more money until this project is completed, turned over to the federal Government and rent payments from the federal Government commence." *Id.* ¶ 33. Based on the combination of financial pressures allegedly resulting from the County's revocation of these permits, Genesis contends that "[b]ankruptcy is . . . a real possibility." *Id.* ¶ 35.

### C.    Council Bill 16-2026

As explained, when Howard County revoked the permits for the Elkridge Property, it did so pursuant to state law, specifically § 1-102(b). But Howard County also enacted a law of its own that at least initially Genesis contended was the basis for the revocation: Howard County Council Bill 16-2026 ("CB 16-2026"). It appears the Howard County Council intended CB 16-2026 to independently require revocation of the permits, as explained below. But, by the time CB 16-2026 was enacted (on February 5, 2026), the permits had already been revoked (three days earlier, on February 2). Moreover, the County has now conceded that CB 16-2026 has no application to the

Elkridge Property as currently provided in the lease agreement given that "a government entity is and will be responsible for this detention facility." ECF No. 36 at 1. Thus, although Genesis's original complaint sought a ruling that CB 16-2026 itself is invalid, that dispute is moot. *See* ECF No. 38 at 2–3 (explaining that because Genesis "cannot contend that CB 16-2026 has ever been applied to the Elkridge [Property] or, in light of [the County's] notice, that there is an reasonable belief that CB 16-2026 will be applied to the Elkridge [Property] in the future, the majority of [Genesis]'s complaint and motion for preliminary injunction are now moot."). But the existence of CB 16-2026 and the circumstances surrounding its enactment remain relevant to Genesis's argument that Howard County used § 1-102 pretextually and that the revocation was instead based on an intent to discriminate against the federal government in violation of the Supremacy Clause of the U.S. Constitution.

On January 30, 2026, Howard County issued a press release referring to the Elkridge Property and Genesis and stating that "the retrofit of private office buildings in Howard County for use of a detention facility raise serious concerns about public health, safety, welfare, and oversight of such facilities." Howard County Maryland, *Howard County Executive Calvin Ball to Submit Emergency Legislation Prohibiting Permitting of Privately-Owned Detention Centers* (Jan. 30, 2026), https://www.howardcountymd.gov/News013026 [https://perma.cc/3AAH-A6YF]. It stated that the County Executive intended to propose an "emergency legislation [that] would restrict the use of privately-owned detention facilities in Howard County as the County determines appropriate future actions." *Id*. The County acknowledged that "[t]he work performed under the permit appears to be nearing completion" but that

13

"Howard County Government is unaware of any specific lease agreements or contracts between . . . Genesis . . . and any federal agency." *Id*. At the time of the January 30 press release, Genesis's permits had not yet been revoked.

CB 16-2026 was introduced in the County Council of Howard County on February 2, 2026. ECF No. 1-3 at 2. The day after the introduction, Councilwoman Liz Walsh issued a statement: "Howard County showed what community is, and who we care about, at a crowded rally before last night's ***introduction of two bills*** [including CB 16-2026] ***to get ICE out of Howard County***. Now." Liz Walsh for Howard County Executive, Facebook (Feb. 3, 2026),

https://www.facebook.com/photo/?fbid=1304269938192155&set=pb.100058274820538.-2207520000 [https://perma.cc/N97A-TP9Q] (emphasis in original). Councilwoman Christiana Rigby stated, "Multiple communities and states that have tried to ban private detention centers because of the lack of oversight, their history of abuse, the unethical standard regarding detention. Most of those avenues have not prevailed against the federal government." Blair Sabol, *Howard County aims to block ICE detention facility by revoking building permit*, WMAR 2 News (Feb. 2, 2026),

https://www.wmar2news.com/homepage-showcase/howard-county-blocks-ice-detention-facility-from-completion-emergency-bills-sent-to-council [https://perma.cc/MGY6-85PR].

On February 4, 2026, Howard County Council held an emergency legislative hearing during which one news report summarized that "County leaders suspect federal officials plan to open and operate an ICE detention facility at" the Elkridge Property. Khiree Stewart, *Howard County leaders, residents hold hearing over proposed ICE*

14

*facility in Elkridge*, WBAL-TV (Feb. 5, 2026), https://www.wbal.com/howard-county-leaders-residents-hold-hearing-over-proposed-ice-facility-in-elkridge [https://perma.cc/Y4N7-EFK3]. For example, Councilwoman Deb Jung offered testimony in support of CB 16-2026 during which she "thanked the public for their overwhelming support in 'standing up against the cruelty of this presidential administration in its approach to immigration.'" April Santana*, Howard County bans private immigration detention centers, halting ICE project*, Baltimore Sun (Feb. 5, 2026), https://www.baltimoresun.com/2026/02/05/howard-county-bans-immigration-detention-centers/ [https://perma.cc/J7S3-TWF5]. County Council Chair Opel Jones "said the legislation was personal to him since the 'unfit and unwelcome' detention center is 'nestled' in his district." *Id.* Councilman David Yungmann "said he was not against an ICE facility coming to Howard County but still voted yes to prohibit the permitting of privately-owned ones because he didn't agree with the location of the potential ICE facility in Elkridge." Tori Yorgey, *Council passes 2 bills aimed at adding guidance for ICE actions across Howard County*, WBAL-TV (Feb. 5, 2026), https://www.wbaltv.com/article/howard-county-council-ice-legislation-passes-detention-centers/70261961 [https://perma.cc/U2UN-UBTW].

On February 5, 2026, Howard County unanimously enacted CB 16-2026 as emergency legislation. ECF No. 40 ¶ 55. CB 16-2026 purported to amend the Howard County Building Code to prohibit the County from issuing I-3 permits to any non-governmental entity:

> No owner or owner's authorized agent, *other than a government agency*, is eligible to make application, obtain, or hold a permit for I-3 Use Group. The building official is

> authorized to suspend or revoke a permit for any owner or
> owner's authorized agent, *other than a government agency*,
> which has been issued a permit but which has not passed final
> inspection as of the effective date of this legislation.

ECF No. 1-3 at 3 (emphasis added).

As stated in a February 2, 2026 memorandum from County Executive Ball in support of the legislation, and consistent with the other legislative history described above, the intent of CB 16-2026 was at least in part to halt completion of the Elkridge Property construction or its delivery to the federal government. ECF No. 1-3 at 5. By the time CB 16-2026 was issued on February 5, Director Frances had already issued the Revocation Letter on February 2. But as Genesis contends, with good reason as discussed below, even though the permits were not revoked *pursuant to* CB 16-2026, the existence of CB 16-2026 and the circumstances surrounding its passage on February 5 remain relevant to the question of whether Howard County violated the Supremacy Clause of the U.S. Constitution when it revoked the permits on February 2.

### D.   Procedural History

Genesis filed this case on March 4, 2026 against Defendants Howard County, Howard County Department of Inspections, Licenses and Permits, Howard County Executive Calvin B. Ball III, in his official capacity, Councilmembers Opel Jones, Chistiana Rigby, Deb Jung, Liz Walsh, and David Yungmann, in their official capacities, and Robert J. Frances, in his official capacity. ECF No. 1. As noted above, the original focus of its lawsuit was on CB 16-2026. In its original complaint, Genesis alleged that the revocation of Genesis's construction permits and the enactment of CB 16-2026" violated the Supremacy Clause and Contract Clause of the U.S. Constitution and 42

U.S.C. § 1983. *Id.* Genesis filed a motion for a preliminary injunction. Genesis

requested that the Court

> enter an order (1) enjoining Defendants from enforcing
> Howard County Council Bill 16-2026, or any related
> legislative or administrative action, to the extent such
> enforcement impairs, restricts, or interferes with Genesis's
> rights and obligations under its lease with the federal
> Government and contracts, or otherwise conflicts with
> federal law or the United States Constitution; and (2)
> directing Defendants to reinstate or reissue and to issue in
> the future, without regard to Council Bill 16-2026, all
> permits, authorizations, and approvals necessary for
> Genesis to perform its obligations under its lease with the
> federal Government, acting through the General Services
> Administration, for the property at issue located in
> Elkridge, Maryland.

ECF No. 16. Defendants filed a response to the preliminary injunction motion and also

filed a motion to dismiss the complaint for failure to state a claim. ECF Nos. 18 & 19.

The federal government filed a statement of interest. ECF No. 24. The Court held a

motions hearing on May 14, 2026. ECF Nos. 33 & 39.

During the May 14 hearing, it became clear that the terms of the lease agreement

between Genesis and the federal government may bear on Genesis's claims. The Court

ordered Genesis to file its lease with the federal government, which it did that same

day. ECF No. 34. The lease was filed under seal because the lease itself expressly

requires the parties to keep it confidential. *See* ECF No. 39, May 14, 2026 Motions

Hearing Transcript 6:20–7:8. But the parties and the federal government have agreed

that the most pertinent provisions need not be sealed. Based on that agreement, the

parties were permitted to disclose in their briefing "that Genesis has a long-term lease

with the General Services Administration—for the benefit of the Department of

Homeland Security and its component Immigration and Customs Enforcement—and that the permit applications disclosed this use to Howard County." ECF No. 50 at 2. The parties further consented that the following paragraph could be unsealed:

> [Genesis] shall comply with all Federal, state, tribal, and local laws applicable to its ownership and leasing of the property, including, without limitation, laws applicable to the construction, ownership, alteration or operation of all buildings, structures, and facilities located thereon, and obtain all necessary permits, licenses and similar items at its own expense. The Government will comply with all Federal, state, tribal, and local laws applicable to and enforceable against it as a Government. This lease shall be governed by Federal law.

ECF No. 34-1 at 67 ¶ 14; *see* ECF Nos. 59 & 62 (Genesis consented to and separately filed motions to unseal briefs containing paragraph 14 of the lease); ECF No. 68, July 2, 2026 Motions Hearing Transcript 6:14–20 (the federal government confirming that paragraph 14 need not be sealed).

As explained above, a substantial concern among County officials—both executive and legislative—was that (1) an immigration detention facility was going to open in their community and (2) a private company was assisting the federal government in doing so (allegedly without explicitly stating the intent for the facility to be used by ICE).

On the second point, the lease confirmed that neither Genesis nor any other private entity was going to be *operating* the facility after construction is complete. Instead, Genesis's role is to deliver a fully constructed facility pursuant to the federal government's specifications, and then to lease the property for the federal government to operate it. ECF No. 34. That is in part because Congress, in addition to directing

DHS to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," 8 U.S.C. § 1231(g)(1), has directed the federal government that, whenever possible, "[p]rior to initiating any project for the construction of any new detention facility," it must "consider the availability for purchase or lease of any existing prison, jail, detention center, or other comparable facility suitable for such use." *Id.* § 1231(g)(2). Accordingly, the Immigration and Nationality Act authorizes the Secretary of DHS "to make contracts . . . to carry out the Secretary's responsibilities under this chapter and otherwise provided by law." 6 U.S.C. § 112(b)(2). DHS's regulations grant the ICE Head of the Contracting Activity the authority to "enter into contracts of up to fifteen years' duration for detention or incarceration space or facilities, including related services." 48 C.F.R. § 3017.204-90.

The disclosure of those lease provisions also confirmed that CB 16-2026 itself did not and would not authorize revocation of the Elkridge Property permits—not only because it was enacted after the permits were revoked, but also because, as the County has put it, "a government entity is and will be responsible for this detention facility." ECF No. 36.[6]

---

[6] Some County officials do not agree with this interpretation, referring to it as a "shocking concession" and stating that the County Council was "led to believe in February 2026 that emergency legislation CB16-2026 was intended to keep [the Elkridge Property] and any other privately owned detention facility out of Howard County." Liz Walsh for Howard County Executive, Facebook (June 6, 2026), https://www.facebook.com/Lizwalshforhoco/posts/the-same-outgoing-administration-that-nearly-permitted-this-facility-through-occ/1405491531403328/ [https://perma.cc/PG2A-7EFS]; Dennis Valera, *Howard County councilwoman demands county leaders step up defense in federal lawsuit*, CBS News (June 3, 2026), https://www.cbsnews.com/baltimore/news/howard-county-councilwoman-demands-county-leaders-defense-federal-lawsuit/ [https://perma.cc/3JM7-JXDA].

Following Defendants' concession that CB 16-2026 would not apply to the Elkridge Property, the Court ordered Genesis to amend its complaint, because the original complaint was premised principally on CB 16-2026 being the basis for the revocation and sought an order invalidating CB 16-2026. ECF No. 38. Specifically, this Court (1) denied in part and reserved in part Genesis's motion for preliminary injunction and (2) granted in part and reserved in part Defendants' motion to dismiss. *Id*. ¶¶ 1, 2. The Court held that, "[a]s Plaintiff cannot contend that CB 16-2026 has ever been applied to the Elkridge [Property] or, in light of Howard County Defendants' notice, that there is any reasonable belief that CB 16-2026 will be applied to the Elkridge [Property] in the future, the majority of Plaintiff's complaint and motion for preliminary injunction are now moot." *Id*. at 3. Given that the remaining arguments related to the constitutionality of a state statute, and that the State of Maryland had not yet been given an opportunity to participate in the case, the Court ordered Genesis to file an amended complaint for any remaining claims as well as a new motion for preliminary injunction and to serve those filings upon the State of Maryland. *Id*. ¶¶ 3– 4. The Court further ordered a briefing schedule for Defendants and the State of Maryland (if it so chose) to file any briefings. *Id*. ¶¶ 5–8; ECF No. 47 (amending the briefing schedule).

Genesis filed an amended complaint, ECF No. 40, and a supplement to its preliminary injunction motion, ECF No. 41. The federal government filed another statement of interest. ECF No. 51. Defendants responded to the supplement to the preliminary injunction motion, ECF No. 53, and filed a motion to dismiss the amended complaint, ECF No. 55. The State of Maryland filed a brief in support of the

constitutionality of § 1-102. ECF No. 56. Genesis then filed a final brief. ECF No. 65. The Court held another hearing on July 2, 2026. ECF Nos. 67 & 68. No notice-and-comment period has ever been initiated for the Elkridge Property. ECF No. 39, May 14, 2026 Motions Hearing Transcript 58:4–9, 81:1–12; ECF No. 68, July 2, 2026 Motions Hearing Transcript 54:1–21.

### E.   Claims

Genesis argues that, as a contractor for the United States, it enjoys federal intergovernmental immunity under the Supremacy Clause and asserts Count 1 based on Defendants' alleged violation of the Supremacy Clause under theories of direct regulation, discrimination, and preemption. ECF No. 40 at 21 & ¶ 104. It argues that "Congress has not authorized" the County "to regulate federal Government's activities with respect to facilities such as the Elkridge [P]roperty"; that the County has "substantially interfere[d] with DHS and the Department of Justice's ability to implement the responsibilities assigned to them by Congress with respect to enforcement of the immigration and naturalization laws of the United States"; and that "Defendants' actions discriminate against the federal Government," and are "in conflict with federal immigration law" as they "severely curtailed the federal Government's discretion to determine where to process and temporarily detain federal immigration detainees and frustrated Congress's delegation of discretion to GSA, DHS, and ICE to discharge their constitutional and statutory responsibilities." *Id*. ¶¶ 106, 108, 109, 111, 112. Therefore, Genesis contends in Count 1 that "[t]o the extent the revocation of the permits is a County effort to enforce the Maryland Corrections Code, they are unconstitutional." *Id*. ¶ 114. As to Count 1, Genesis seeks injunctive relief. *Id*. ¶ 119.

Count 2 asserts that the County violated the Contract Clause of the U.S. Constitution, *id.* at 24, specifically by imposing "a substantial impairment of the contractual relationship between Genesis and the GSA, acting on behalf of the federal Government, as memorialized in the Lease." *Id.* ¶ 122. Genesis contends that, as "Defendants' actions do not advance a significant and legitimate public purpose and they were not undertaken appropriately or reasonably," the "actions therefore constitute a substantial and unconstitutional impairment of Genesis's contractual relationship with the federal Government." *Id.* ¶¶ 124–125. As to Count 2, Genesis seeks injunctive relief. *Id.* ¶ 126.

Finally, in Count 3, Genesis seeks compensatory damages and attorneys' fees under 42 U.S.C. § 1983 based on the harm to Genesis caused by Defendants' alleged violations of the Supremacy and Contract Clauses. *Id.* at 26 & ¶ 130. It contends that Defendants violated the statute because their "actions, which violate the Supremacy Clause and Contract Clause and multiple provisions of Titles 6 and 8 of the United States Code, deprived (and continue to deprive) Genesis of rights, privileges, and/or immunities secured by the Constitution and laws of the United States." *Id.* ¶ 131.

### F.    Motions and Requests

Genesis contends that it is entitled to a preliminary injunction because the County's application of § 1-102(b) to revoke the permits is unconstitutional and because Genesis has and will continue to suffer irreparable harm and the public interest favors an injunction. ECF No. 41 at 8, 16. It seeks an order vacating the revocations and reinstating the permits as "necessary for Genesis to perform its obligations under its

22

lease with the United States of America, acting through the GSA, for the Elkridge [P]roperty." *Id.* at 17.

Defendants filed a motion to dismiss for failure to state a claim. ECF No. 55. They argue that Counts 1 and 2 fail because local governments are not required to grant the federal government permits if such permit would violate state or local laws and that the County has done nothing more than follow state law, specifically § 1-102(b). ECF No. 55-1 at 9. They argue that Genesis's § 1983 claim (Count 3) should be dismissed because Genesis fails to identify a substantive right covered by § 1983 that was violated. *Id.* at 19–20.

The United States filed a statement of interest in this case, arguing that by revoking the permits in the way it did so (including pursuant to § 1-102(b)), the County has "override[n] federal decisions to lease office space from nongovernmental entities and to operate detainee processing facilities in accordance with federal standards." ECF No. 51 at 10. The federal government contends that this violates the Supremacy Clause by "impermissibly regulating federal operations and federal contractors in direct contravention of Supreme Court precedent; discriminating against the Federal Government and federal contractors; and interfering with federal statutory and regulatory mandates." *Id.*

The State of Maryland filed a brief in this case, arguing that an as-applied challenge to § 1-102(b) is not ripe for consideration because the revocation of the permits were pursuant to the Howard County Building Code, not § 1-102(b), and that the procedures of § 1-102(b) have never been applied to the Elkridge Property. ECF No.

56 at 17–23. It further contends that, should the Court reach the constitutional question, it should find that § 1-102(b) was constitutional as applied. *Id.* at 23–35.

## II.    Standards of Review

### A.    Motion for Preliminary Injunction

A preliminary injunction is a form of equitable relief intended to prevent irreparable harm while a lawsuit remains pending. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). To obtain a preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in its favor; and (4) an injunction is in the public interest. *See Winter*, 555 U.S. at 20; *League of Women Voters*, 769 F.3d at 236; *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 168–69 (4th Cir. 2025). The third and fourth factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

### B.    Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). At the pleadings stage, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King*, 825 F.3d at 212.

To withstand a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative relief" by containing "enough facts

to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although a court reviewing a 12(b)(6) motion must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff," *King*, 825 F.3d at 212, bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal*, 556 U.S. at 679.

## III.   Counts 2 and 3 fail to state claims on which relief can be granted

Having considered the briefs from Genesis along with those from three levels of government (the County, the State of Maryland, and the federal government), the Court concludes that Genesis has not stated a claim on which relief can be granted under the Contract Clause of the U.S. Constitution (Count 2) or for damages and attorneys' fees under § 1983 (Count 3).

### A.   Contract Clause (Count 2)

Article I, Section 10 of the United States Constitution prohibits states from passing any law "impairing the Obligation of Contracts." U.S. Const., Art. I, Sec. 10. "The origins of the Clause lie in legislation enacted after the Revolutionary War to relieve debtors of their obligations to creditors," though it now "applies to any kind of contract." *Sveen v. Melin*, 584 U.S. 811, 818 (2018) (citing *Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 502–503 (1987)). But "not all laws affecting pre-existing contracts violate the Clause." *Id.* "The Clause is not . . . the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannus*, 438 U.S.

25

234, 240 (1978). Rather, a plaintiff pursuing a Contract Clause claim must satisfy two elements.

First, a plaintiff must establish that "the state law has 'operated as a substantial impairment of a contractual relationship.'" *Sveen*, 584 U.S. at 819 (quoting *Spannus*, 438 U.S. at 244). "In answering that question, the [Supreme] Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* (citing *Spannus*, 438 U.S. at 246). "[N]ot all impairments are substantial for Contract Clause purposes." *Balt. Tchrs. Union, Am. Fed'n of Tchrs. Local 340, AFL-CIO v. Mayor & City Council of Balt.*, 6 F.3d 1012, 1017 (4th Cir. 1993). "While the [Supreme] Court has not refined the analysis for assessing the substantiality of an impairment, it has appeared to assume that an impairment is substantial at least where the right abridged was one that induced the parties to contract in the first place or where the impaired right was one on which there had been reasonable and especial reliance." *Id.* (citations omitted). For example, the Supreme Court "has refused to invalidate a state's statute of repose," because "the reinstatement right affected by the statute [at issue in *City of El Paso v. Simmons*, 379 U.S. 497 (1965)] 'was not the central undertaking of the seller nor the primary consideration for the buyer's undertaking.'" *Id.* (citing *El Paso*, 379 U.S. at 514).

Second, "[i]f such factors show a substantial impairment," courts ask "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 584 U.S. at 819 (quoting *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983)); *see also Balt. Tchrs.*

26

*Union*, 6 F.3d at 1015 (explaining the test in three steps: (1) whether a law or ordinance has impaired a contract; (2) whether any impairment was substantial; and (3) whether any impairment is nonetheless permissible). In other words, even if a state law has "operated as a substantial impairment of a contractual relationship," the state law only violates the Contract Clause of the U.S. Constitution if it fails to advance a "significant and legitimate public purpose." *Sveen*, 584 U.S. at 819.

Genesis argues that "the *actions* of Howard County and its officials—in cancelling the Permits and enacting legislation seeking to prohibit the project—interfere with Genesis's lease with the federal Government." ECF No. 41 at 15 (emphasis added); *see also* ECF No. 16-1 at 33. It similarly asserts that "Defendants' *actions* undermine Genesis and the federal Government's contractual bargain, interfere with both parties' reasonable expectations, and prevent both parties from safeguarding their rights." ECF No. 40 ¶ 123 (emphasis added). Genesis disagrees with the County's reading of § 1-102(b) as applying to the Elkridge Property in the first place; "[b]ut even assuming the statute applied," Genesis contends that "the County's last-minute application of it" violated the Contract Clause. ECF No. 60 at 31.

Even accepting Genesis's factual allegations as true, its Contract Clause claim fails for two reasons.

First, the Contract Clause prohibits a "*State*" from "pass[ing] any . . . *Law* impairing the Obligation of Contracts." U.S. Const. Art. I, § 10, Cl. 1 (emphases added). The focus of the Contract Clause analysis is on the enactment or application of a state law to a specific contract. *Compare Balt. Tchrs. Union*, 6 F.3d at 1014–18 (holding that a city ordinance that cut state employees' salaries constituted a substantial impairment

on the contracts those employees had with the city), *with Sveen*, 584 U.S. at 819–20 (holding that the state revocation statute did not substantially impair pre-existing contracts but instead supported them). Here, Howard County revoked the permits pursuant to a state statute, § 1-102(b). Genesis does not contend that when Maryland passed that statute it effected any impairment of Genesis's contractual rights. It was not until Howard County revoked the permits that Genesis's contractual expectations under its lease with GSA were impaired. Genesis has not identified any case permitting a Contract Clause claim to proceed based on an indirect impairment of contractual rights like the theory of liability underlying Count 2.

Second and more fundamentally, a Contract Clause claim arises only where a state law itself has imposed a "substantial" impairment on a contract. *Balt. Tchrs. Union*, 6 F.3d at 1017. In opposing Defendants' motion to dismiss Count 2, Genesis cites only one case that permitted a Contract Clause claim to proceed: the *Baltimore Teachers Union* case. *See* ECF No. 60 at 31. But that case involved a state law that directly extinguished or diminished a concrete, calculable contractual expectation. *See Baltimore Tchrs. Union,* 6 F.3d at 1014 ("[F]ull-time city employees, except for firefighters, who enjoy certain privileges, lost the annual equivalent of 2.5 days of pay, or .95% of their gross annual salary, and Baltimore saved approximately $2 million, which it does not intend to refund.").[7] As explained below, Howard County's

---

[7] Genesis also cites *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926). But in that case, the Supreme Court rejected the Contract Clause claim—and did so even at the height of the *Lochner* era. *Id.* at 388. Genesis also cites *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Baltimore*, in which landlords challenged Baltimore City laws during the COVID pandemic restricting landlords from increasing

application of § 1-102(b) is unconstitutional because it singles out the federal government and imposes a burden specifically because of Genesis's status as a federal government contractor on project involving an exclusively federal function. *See* § IV.D.2, *infra*. But that is a Supremacy Clause problem, not a Contract Clause problem.

Genesis contends that Howard County's revocation of its building permits, its delay in determining that § 1-102 applies, and its current *failure* to apply § 1-102 and initiate the notice-and-comment period are what have impaired its contractual relationship with the federal government. If the County had initiated a notice-and-comment process upon receipt of Genesis's original application in September 2024 and run that process concurrent with its review of the application, the process purportedly *required by § 1-102(b)* would not have *itself* "substantially impaired" a contractual expectation of the type analogous to the impairments recognized in Contract Clause cases. On the face of Genesis's complaint, Genesis did not apply for permits until over sixteen months after executing its lease and received the first permit four months later and the second permit another six months later. *Id.*; *see* ECF No. 40 ¶¶ 33, 35, 38. Given that § 1-102 does not preclude consideration of other aspects of the permit application while the notice-and-comment period is ongoing, the six-month notice-

---

rent or assessing late fees on tenants. 563 F. Supp. 3d 428 (D. Md. 2021). In *Willowbrook*, the court accepted the contention that the restrictions "substantially impair[ed] the Plaintiffs' contracts with tenants who had already agreed to rent increases before the Acts were enacted." *Id.* at 450–51. That impairment is fundamentally different from the impairment here—plus the *Willowbrook* court granted the City summary judgment under the second prong of the Contract Clause analysis because there was "nothing in the record to suggest that the Acts were irrational or illegitimate." *Id.* at 451–52.

and-comment period, if it had been requested and/or applied at the beginning of the process, could have occurred simultaneously with the twenty-six months between execution of the lease and issuance of the final permit or the ten months between the permit application and the final permit issuance thus not causing any delay. Thus, the notice-and-comment process that the state law purports to require would have entailed a possibility of delay, not an extinguishment or diminution of a contractual right. For these reasons, Genesis has failed to allege how the statute "undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights" to constitute a *substantial* impairment for Contract Clause purposes. *Sveen*, 584 U.S. at 819 (citing *Spannus*, 438 U.S. at 246).

Accordingly, Genesis has failed to state a claim under the Contract Clause. The motion to dismiss Count 2 will be granted, Count 2 will be dismissed without prejudice, and the preliminary injunction motion will be denied insofar as it relies on Count 2.

### B.    42 U.S.C. § 1983 (Count 3)

42 U.S.C. § 1983 offers redress for violations of certain constitutional rights; it "'is not itself a source of substantive rights,' [it] merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Therefore, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989); *Baker*, 443 U.S. at 140); *see Gaines v. Balt. Police Dep't*, 657 F. Supp. 3d 708, 748 (D. Md. 2023) (quoting *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017)) (to state a claim, a plaintiff must "pinpoint the specific right that has been infringed").

Here, the substantive rights that Genesis alleges have been violated are the Contract Clause and the Supremacy Clause of the U.S. Constitution. As explained above, the Contract Clause claim fails to state a claim on which relief can be granted, and thus does not form a basis for Genesis's § 1983 claim either.[8] That leaves Genesis's claim under the Supremacy Clause. But "the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)) (internal citations omitted). Therefore, claims under the Supremacy Clause, particularly federal preemption, also are not actionable under Section 1983. *Md. Pest Control Ass'n v. Montgomery Cnty., Md.*, 884 F.2d 160, 162–63 (4th Cir. 1989) (citing *White Mountain Apache Tribe v. Williams*, 810 F.3d 844, 848 (9th Cir. 1985), *cert. denied*, 479 U.S. 1060 (1987); *Segundo v. City of Rancho Mirage*, 813 F.2d 1387, 1394 (9th Cir. 1987); *J. & J. Anderson, Inc. v. Town of Erie*, 767 F.2d 1469, 1476–77 (10th Cir. 1985); *Wis. Dep't of Indus., Lab. & Hum. Rels.*, 750 F.2d 608 (7th Cir. 1984), *aff'd on other grounds*, 475 U.S. 282 (1986)). Thus, under binding Fourth Circuit caselaw, Genesis has no right to seek damages or fees under § 1983 based on its Supremacy Clause claim.

---

[8] Genesis's § 1983 claim based on the Contract Clause also fails for the additional reason that "an attempted § 1983 action alleging state impairment of a private contract will not lie." *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011) (citing *Carter v. Greenhow*, 114 U.S. 317, 322–323 (1885)). Genesis concedes that "the Fourth Circuit is currently on the side of the split that holds that a Section 1983 claim based on the Contract Clause is generally not viable," although it preserves its objection to that position. ECF No. 60 at 35–36 (citing *Crosby*, 635 F.3d at 641). Under *Crosby*, Genesis cannot assert a § 1983 claim under the Contract Clause.

Genesis falls back on language in a footnote in a later Fourth Circuit case, *Waste Management Holdings, Inc. v. Gilmore*, which stated that "[w]hile 'the Supremacy Clause, of its own force, does not create any rights enforceable under § 1983,'" certain "federal documentation provisions governing the use of vessels in the coastwise trade" at issue in that case "confer[red] a right in the form of a license to operate freely in each state's waters subject only to the legitimate exercise of a state's police powers," which in turn conferred "standing to assert [a] Supremacy Clause claim under § 1983." 252 F.3d 316, 348 n.12 (4th Cir. 2001) (quoting *Golden State Transit Corp.*, 493 U.S. at 107, and citing *Douglas v. Seacoast Prods., Inc.*, 431 U.S. 265 (1977)). To attempt to bring its Supremacy Clause claim within that language in *Waste Management*, Genesis points in its brief to 8 U.S.C. §§ 1103 and 1231, which as Genesis puts it "vest the federal Government with exclusive authority to contract and lease space for immigration detention purposes." ECF No. 60 at 34 (citing ECF No. 16-1 at 9, 18–20, 23–24, 27–29). It argues that these statutes "confer[] upon Genesis, as a leaseholder under a federally authorized and federally preferred contractual arrangement, a right to operate free from state or local interference." *Id*. But unlike the documentation regulations in *Waste Management*, which "confer[ed] a right in the form of a license to operate freely in each state's waters subject only to the legitimate exercise of a state's police powers," 252 F.3d at 348 n.12, 8 U.S.C. §§ 1103 and 1231 do not create any statutorily conferred rights, but rather express a congressional preference for the Attorney General to lease rather than purchase facilities for immigration enforcement. Further, for a Rule 12(b)(6) motion, the Court looks at what is pled in the complaint, and a vague reference

32

to "Titles 6 and 8 of the United States Code" is insufficient to point to a specific right that had been infringed. *See* ECF No. 40 ¶ 131.

Accordingly, Count 3 will be dismissed. As for the § 1983 claim based on the Contract Clause, it will be dismissed without prejudice based on the dismissal of Count 2 and in light of *Crosby*. As for the § 1983 claim based on the Supremacy Clause claim, the dismissal will be without prejudice in light of the language in *Waste Management* that in some narrow circumstances such a claim can proceed (although as explained above Genesis has thus far not alleged or articulated any viable theory).

## IV.    Supremacy Clause Claim (Count 1)

For the reasons explained thus far, Genesis has not stated claims on which relief can be granted under the Contract Clause of the U.S. Constitution or 42 U.S.C. § 1983. That leaves Genesis's Supremacy Clause claim for injunctive relief, which has been the parties' primary focus. As explained above, Genesis's original claim was that Howard County's CB 16-2016 violates the Supremacy Clause. But as this Court already ruled, that claim is moot, following the County conceding that "Council Bill 16-2026 will not have application to the building permit for the property under the lease that has been supplied, because a government entity is and will be responsible for this detention facility." ECF No. 36. Instead, the question for purposes of Count 1 in Genesis's amended complaint is whether the County violated the Supremacy Clause when it applied § 1-102(b) as the basis for revoking the permits for the Elkridge Property. The Court begins by addressing three threshold questions: whether § 1-102(b) applies to the Elkridge Property at all; whether Genesis's Supremacy Clause claim is ripe; and whether Genesis's Supremacy Clause claim is a facial challenge to § 1-102(b) or an as-applied

33

challenge. The Court then explains why Genesis has shown a likelihood of success on the merits of that claim and why the other preliminary injunction factors also favor Genesis.

A.     **Section 1-102 applies to the Elkridge Property**

The first threshold dispute is whether § 1-102 applies to the Elkridge Property at all. If not, then that alone would potentially entitle Genesis to an order reinstating the permits, because § 1-102 was the County's sole basis for revoking the permits.

Section 1-102(b) prohibits a local government from, among other things, "issu[ing] a permit for the construction of a building or the reuse of existing buildings or structures by any private entity for use as an immigration detention facility" until the completion of the 180-day notice-and-comment period and two public meetings. Md. Code Ann, Corr. Servs. § 1-102(b). This aspect of the dispute turns on whether the phrase "by any private entity" refers to the construction or reuse of a building (which Genesis, a private entity, is doing) or to the "use as an immigration detention facility" (which there is no dispute Genesis will not be doing; the federal government will operate the facility upon completion).

As explained above, Genesis purchased the Elkridge Property, has been renovating it per DHS's specifications, and upon completion will continue to own the building but will be leasing it to GSA (for use by DHS). When the County revoked the permits, it took the position that § 1-102(b) applies here because this project entails the "construction of a building or the reuse of existing buildings or structures by a[] private entity [Genesis]" and because the phrase "by any private entity" refers only to the entity doing the construction—not the entity that will then "use" the building "as an immigration detention facility" (the federal government). The County and State reiterate

34

that statutory interpretation in this Court. ECF No. 55-1 at 17 (Defendants arguing that the statute "applies to Genesis' exact circumstances as they are now alleged to exist: a private entity constructing and renovating a structure for use as an immigration detention facility"); *see also* ECF No. 56 at 19 (State's brief, agreeing that "Section 1-102(b) applies to Genesis's facility"). They point out that the same legislature that enacted § 1-102(b) also enacted § 1-102(a), which specifically discusses who *owns* and *operates* the subject detention facility, and thus the omission of this language indicates an intent by the legislature to focus on the construction rather than ownership or operation of the facility. ECF No. 55-1 at 17–18.

Genesis argues that because the phrase "by any private entity" precedes "for use as an immigration detention facility" "and is not separated by any punctuation, evidencing a direct grammatical link," it therefore "impl[ies] that the prohibition specifically targets only facilities constructed by a private entity *to be used by that private entity*." ECF No. 29 at 14 (emphasis added). It further argues that "[t]he ordered chain of 'reuse . . . by any private entity . . . for use' reinforces the Legislature's focus on preventing state actors from issuing permits for buildings to be used as immigration detention facilities by the private entity doing the work." *Id.* at 15. Genesis argues that the "Fiscal and Policy Note" that accompanied the House Bill supports its reading. *Id.*

The County and State's construction is the only one consistent with the plain text of § 1-102(b). The statute unambiguously applies to the Elkridge Property. Genesis, a private party, is the one doing the construction/renovation of a building for the purposes of it being used as an immigration detention facility (even if only a small portion of the building would actually serve a temporary detention function). As the

35

County points out, to read the statute otherwise would be to essentially move the phrase "by any private entity" later in the statute such that it reads "for use [by any private entity] as an immigration detention facility." *See* ECF No. 55-1 at 17. But that is not what the statute says; instead it refers to "construction . . . by any private entity for use as an immigration detention facility." The phrase "by any private entity" plainly refers to the entity doing the construction—not to the entity that may "use [the completed facility] as an immigration detention facility." That plain reading is confirmed by reviewing the statute as a whole. If the legislature had intended § 1-102(b) to apply only to private entities that *operate* an immigration detention center, it would have used language similar to what it used in § 1-102(a).

For these reasons, § 1-102(b) unambiguously applies to Genesis's construction of the Elkridge Property. Because the text is unambiguous, the Court rejects the State and County's request that any ambiguity regarding the interpretation of § 1-102 be certified to the Maryland Supreme Court. *See* ECF No. 56 at 19 n.4; ECF No. 55-1 at 18.

### B.    Genesis's claims are ripe for review

The next threshold question for Genesis's Supremacy Clause claim is whether this Court has jurisdiction to reach it. The State argues that the claim is not ripe because Genesis's "lawsuit focuses entirely on the revocation of its building permits." ECF No. 56 at 17. It contends that Genesis's permits "were revoked '[p]ursuant to § 105.6 of the Howard County Building Code,' not Section 1-102(b)," *id.* at 17 (quoting the last paragraph of the Revocation Letter), and thus "any 'as-applied challenge' to the state statute 'is not fit for judicial resolution,'" *id.* at 18 (quoting *Lynchburg Republican City Comm. v. Va. Dep't of Elections*, 793 F. Supp. 3d 765, 775 (W.D. Va. 2025)).

36

"A case is not ripe for judicial determination 'if the plaintiff has not yet suffered injury and any future impact remains wholly speculative.'" *Whitaker v. Monrow Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022) (quoting *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013)). Conversely, "a case is ripe for judicial decision when the 'controversy is final and not dependent on future uncertainties.'" *Id.* (quoting *Doe*, 713 F.3d at 758).

The State's ripeness argument fails because, among other problems, it disregards the actual language of the Revocation Letter. True, the last paragraph states, "Pursuant to § 105.6 of the Howard County Building Code, this Department is 'authorized to suspend or revoke a permit issued under the provisions of this code wherever the permit is issued in error or on the basis of incorrect, inaccurate or incomplete information, or in violation of any ordinance or regulation or any of the provision of this code.'" ECF No. 1-2 at 2. But immediately before that paragraph, the County made clear that the *reason* it was revoking the permits was § 1-102(b). *Id.* And the State itself takes the position that § 1-102(b) "applies to Genesis's facility." ECF No. 56 at 19. It is the County's application of § 1-102(b) that has resulted in revocation of Genesis's permits and that is blocking Genesis from completing performance on its contractual obligations to the federal government. It may be true, as the State contends, that § 1-102(b) did not "compel" the County to revoke the permits. *Id.* at 18. But the County did revoke the permits and did so based on § 1-102(b). Genesis's claim challenging the revocation under the Supremacy Clause, including based on the County's application of § 1-102(b), is ripe.

### C.      Facial vs. as-applied constitutionality

The last threshold question for Genesis's Supremacy Clause claim, before

reaching the merits of that claim, is whether that claim is a facial constitutional

challenge or an as-applied challenge. As the briefing developed, Genesis has confirmed

that it is asserting only an as-applied challenge to § 1-102(b)—as opposed to a facial

challenge and, therefore, the County and the State of Maryland has responded to the

arguments as such. *See, e.g.*, ECF No. 41 at 5 (Genesis); ECF No. 68, July 2, 2026

Motions Hearing Transcript 30:25–32:14 (Genesis); ECF No. 55-1 at 12 (Defendants);

ECF No. 56 at 23 (State of Maryland stating "[t]o the extent this Court finds it necessary

to reach the constitutional question, it should find that Section 1-102(b) is

constitutional should it be applied to the Elkridge [P]roperty"). The federal government

accepted that framing in its brief as well, *see* ECF No. 51 at 3, though, at the motions

hearing, it argued that the Court should rule § 1-102(b) to be facially unconstitutional,

ECF No. 68, July 2, 2026 Motions Hearing Transcript 77:17–78:3.

In general, a "facial challenge to a legislative Act" requires a challenger to

"establish that no set of circumstances exists under which the Act would be valid,"

*United States v. Salerno*, 481 U.S. 739, 745 (1987), or that a statute has no "plainly

legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442,

449 (2008); *see also id.* at 450 (describing some of the reasons "[f]acial challenges are

disfavored"). In contrast, an as-applied challenge asks whether "the law is

unconstitutional as applied to the challenger's case," *United States v. Lane*, 689 F.

Supp. 3d 232, 237 (E.D. Va. 2023)—though some commentators have observed that the

line between facial and as-applied challenges is not as bright as is sometimes

articulated. *See Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1336 (2000) ("Facial challenges are not sharply categorically distinct from as-applied challenges to the validity of statutes.").

Here, Genesis argues that it need not establish that § 1-102(b) violates the Supremacy Clause in all its applications—although it has not identified any applications that, consistent with its Supremacy Clause claim, would be constitutional. *See* ECF No. 68, July 2, 2026 Motions Hearing Transcript 30:25–32:14 (Genesis explaining that its position is that there is no constitutional application of § 1-102 but that it need not grapple other applications as it is only asserting an as-applied claim). Instead, Genesis argues that, to the extent § 1-102(b) applies to the Elkridge Property, that application is unconstitutional. *See, e.g.*, ECF No. 60 at 16 ("The County's application of Section 1-102(b) violated the intergovernmental immunity doctrine").

The Court will accept that framing, at least for purposes of Genesis's preliminary injunction motion and Defendants' motion to dismiss. *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 248–49 (2010) ("Although the nature of its challenge is not entirely clear from the briefing or decisions below, counsel for Milavetz insisted at oral argument that this is 'not a facial challenge; it's an as-applied challenge.' Tr. of Oral Arg. 26. We will approach the question consistent with Milavetz's characterization."). There is a serious question whether it even makes sense to ask in the context of this case whether § 1-102(b) violates the Supremacy Clause "as applied," given that Genesis challenges the constitutionality of a state statute that facially applies only to a federal government function: federal immigration enforcement. The Supremacy Clause renders the Constitution supreme, "any Thing in the Constitution or

39

Laws of any State to the Contrary notwithstanding." U.S. Const. art. IV, cl. 2. "Logically read, a 'Thing' refers to a provision of law, not an application of that provision to privileged conduct." Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 248 (1994). "Applications, after all, arise not 'in' laws, but, by definition, from applying them." *Id.* In other words, "the Supremacy Clause directs itself primarily at unconstitutional *laws*; only derivatively does it prevent unconstitutional applications of constitutional laws." *Id.* at 248 n.52.[9]

Nonetheless, the Court will accept the parties' framing of the legal question and will adjudicate the claim that Genesis has asserted: that § 1-102(b) violates the Supremacy Clause *as applied to the Elkridge Property*, and specifically whether the County's revocation of the permits pursuant to § 1-102(b) violates the Supremacy Clause. And although, as explained below, the County has likely violated the Supremacy Clause by revoking Genesis's permits pursuant to § 1-102(b), there may be circumstances where application of § 1-102(b) would be constitutional. Nonetheless, given the unusual circumstances of this state statute, which expressly applies only to an exclusively federal function, the Court analyzes the as-applied constitutionality cognizant that ruling that § 1-102(b) is unconstitutional as applied may be functionally equivalent to a ruling that § 1-102(b) is facially unconstitutional.

---

[9] Different types of Supremacy Clause claims may not present this threshold question, with as-applied and facial challenges being more logically distinguished. *See H & R Block E. Enters., Inc. v. Raskin*, 591 F.3d 718, 723 n.11 (4th Cir. 2010) (distinguishing between facial vs. as-applied conflict preemption challenges).

**D.    Genesis has shown a strong likelihood of success on the merits on its Supremacy Clause claim based on intergovernmental immunity**

Because § 1-102(b) unambiguously applies to Genesis's construction of the Elkridge Property (contrary to Genesis's position), *see* § IV.A., *supra.,* and because Genesis's as-applied constitutional challenge to § 1-102(b) is ripe (contrary to the State's position), *see* § IV.B., *supra.,* the Court now turns to the merits of that challenge.

Under the Supremacy Clause of the U.S. Constitution, the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. IV, cl. 2. One doctrine that effectuates this principle is the intergovernmental immunity doctrine, which was first articulated in the seminal case *McCulloch v. Maryland*. In *McCulloch*, the Supreme Court held that "states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." 17 U.S. 316, 436 (1819). "Over time" the doctrine has "evolved." *United States v. Washington*, 596 U.S. 832, 838 (2022) (hereinafter, "*U.S. v. Washington*"[10]). Under its current formulation, the intergovernmental immunity doctrine prohibits application of two types of state or local laws (unless Congress has "clearly and unambiguously authorized" the law, *id*. at 840): state laws that directly regulate the federal government or its contractors and state laws that single out the federal government or its contractors for unfavorable treatment.

---

[10] As distinguished from *Washington v. United States*, 460 U.S. 536, 546 (1983), one of the other seminal intergovernmental immunity cases, which will hereinafter be referred to as "*Washington v. U.S.*"

### 1.    Direct regulation

The direct regulation prong "prohibit[s] state laws that . . . 'regulat[e] the United States directly' . . . or those with whom it deals' (*e.g.*, contractors)." *Id.* at 838 (quoting *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion) and citing *id.* at 444 (Scalia, J. concurring in judgment)). It does not "bar[] all state regulation which may touch the activities of the Federal Government." *Hancock v. Train*, 426 U.S. 167, 179–80 (1976) (citations omitted). But a state law does violate the direct regulation principle when it "places a prohibition on the Federal Government." *Id.* at 180.

The prohibition on state or local governments directly regulating the federal government also extends in certain circumstances to regulation of federal *contractors*. For example, "federal contractors cannot be required to satisfy state 'qualifications in addition to those that the [Federal] Government has pronounced sufficient.'" *United States v. Com. of Va.*, 139 F.3d 984, 990 (4th Cir. 1998) (quoting *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956), and *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)). "[J]ust as states cannot regulate the federal government itself, they cannot regulate private parties in a way that severely undercuts a federal function." *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 322 (3d Cir. 2025) (citing *Osborn v. Bank of U.S.*, 22 U.S. 738, 786–89 (1824)). To be sure, "states can impose many laws on federal contractors that they could not apply to the federal government itself"—such as taxes— but "any state regulation that purports to override the federal government's decisions about who will carry out federal functions runs afoul of the Supremacy Clause." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 750 (9th Cir. 2022) (en banc).

42

Genesis argues that the County violated the direct regulation prong of the intergovernmental immunity doctrine because "[a]pplying Section 1-102(b) to the Elkridge [Property] . . . directly interfer[es] with, and obstruct[s] the federal Government's immigration enforcement authority, a core federal Government function." ECF No. 41 at 10. Specifically, Genesis points to the fact that, under § 1-102(b), "before a federal contractor can receive a building permit for an immigration detention facility operated by the federal Government it must wait 'at least 180 days,'" the result being "to delay 180 days federal Government's immigration enforcement activities—to the extent it occurs through leased property—by at least a half year." *Id*. And it relies on various cases, including two that have invalidated state laws that purported to entirely prohibit the federal government from contracting with private companies to operate immigration detention facilities.[11]

The Court need not and does not decide Genesis's claim based on direct regulation. The County may or may not be *directly regulating* the federal government or its contractor within the meaning of the intergovernmental immunity doctrine. The Court need not reach the question because regardless of whether a state law directly "regulates" the federal government or its contractors, the intergovernmental immunity

---

[11] Those cases are the Ninth Circuit's *en banc* decision in *Geo Group*, 50 F.4th at 745, and the Third Circuit's decision in *CoreCivic*, 145 F.4th at 315. Although those cases lay out the standards for applying the intergovernmental immunity doctrine, the holdings in those are inapposite for multiple reasons, including that, unlike here, the proposed facilities in *Geo Group* and *CoreCivic* were (a) actual long-term detention facilities, as opposed to office spaces with some temporary holding cells, and (b) were to be actually operated by private contractors, unlike the Elkridge Property which is to be run by the federal government once construction is complete.

doctrine separately prohibits states or local governments from applying laws that "discriminate against the Federal Government or those with whom it deals." *Washington v. U.S.*, 460 U.S. at 544–45. Genesis has made a strong showing on the merits of its claim that § 1-102(b), as applied by the County to the Elkridge Property, violates the discrimination prong of the intergovernmental immunity doctrine.

### 2. Discrimination

"The mere fact that the Act touches on an exclusively federal sphere is not enough to establish discrimination" for purposes of intergovernmental immunity. *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022). Rather, a claim that a state law is impermissibly discriminatory for Supremacy Clause purposes requires establishing that the state law "singles out the Federal Government [or its contractors] for unfavorable treatment." *U.S. v. Washington*, 596 U.S. at 840. A state law "singles out" the federal government or its contractors for "unfavorable treatment" if it "regulates them unfavorably on some basis *related to their governmental 'status.'*" *Id.* at 839 (quoting *Washington v. U.S.*, 460 U.S. at 546) (emphasis added). Moreover, "*[a]ny* economic burden that is discriminatorily imposed on the federal government is unlawful"; there is no "de minimis exception" to the discrimination intergovernmental immunity doctrine. *United States v. California*, 921 F.3d 865, 883–84 (9th Cir. 2019); *see e.g., Dawson v. Steager*, 586 U.S. 171, 177–79 (2019) (considering only whether there was an unfavorable treatment rather than analyzing *how* unfavorable the treatment was); *Washington v. U.S.,* 460 U.S. at 544–46 (considering only whether the federal government was treated more or less favorably than others, not the extent of any burden).

44

After all, "[d]iscrimination" is "often described as treating similarly situated persons differently." *Dawson*, 586 U.S. at 177 (citing *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 815–16 (1989); *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 383 (1960)). A regulation is not discriminatory if "it be imposed equally on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438. In other words, "[t]he State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. U.S.*, 460 U.S. at 544–45. But where a state law *does* regulate the federal government or treat a federal government unfavorably related to its governmental status, and where the federal government has not "provide[d] clear and unambiguous authorization for this kind of state regulation," *U.S. v. Washington*, 596 U.S. at 839–40 (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988)) (cleaned up), it runs afoul of the anti-discrimination prong of the intergovernmental immunity doctrine.[12]

For example, in *U.S. v. Washington*, the Supreme Court held that a Washington State workers' compensation law that "applie[d] only to federal workers who work at one federal facility in Washington" violated the intergovernmental immunity doctrine by "singling out the Federal Government for unfavorable treatment." 596 U.S. at 839. The state law "explicitly treat[d] federal workers differently than state or private

---

[12] A discrimination claim cannot be used as "an end-run around the Tenth Amendment" where a state has merely "decline[d] to assist with federal immigration efforts." *New York*, 810 F. Supp. 3d at 355–56 (quoting *Illinois*, 796 F. Supp. 3d at 535; citing *California*, 921 F.3d at 889–90). That exception does not apply here; this case does not involve a request by the federal government for the State of Maryland to "assist with federal immigration efforts."

workers . . . [a]nd in doing so, the law impose[d] upon the Federal Government costs that state or private entities d[id] not bear." *Id.* In *Dawson*, the Supreme Court considered a state statute that does not tax the pension benefits of certain former state law enforcement employees but did tax all former federal employees. 586 U.S. at 173. The Supreme Court held that, because the state law provided a benefit to state retirees based on certain job responsibilities but did not provide the benefit to federal retirees with the same or comparable job responsibilities—particularly where there are no "significant differences" between the two groups—it discriminated against the federal government and was unconstitutional. *Id.* at 175, 178–80.

Section 1-102, insofar as it has been applied to Genesis and the Elkridge Property, impermissibly violates these principles.

Section 1-102(b) explicitly singles out the federal government by applying only to immigration detention facilities, a function exclusively of the federal government—and, if there were any confusion, the statute expressly applies to facilities that "detain individuals for *federal* civil immigration violations." Md. Code. Ann., Corr. Servs. § 1-101(j) (emphasis added). Section 1-102(b) then treats these federal detention facilities differently than state or local detention facilities by requiring an additional procedure and source of delay (*i.e.*, "unfavorably," *see U.S. v. Washington*, 596 U.S. at 839) that applies only to facilities for this exclusively federal function.

The County and State argue that Genesis cannot show discrimination because it has not identified a "comparator." *See* ECF No. 53 at 17–18; ECF No. 56 at 28–29. But Genesis has amply shown that § 1-102(b) operates to impose a burden on the Elkridge Property that (a) does not apply to other I-3 detention facilities or other temporary

detention facilities like a police precinct or courthouse and (b) applies to the Elkridge Property precisely *because* the purpose of the facility is for (in small part) federal immigration detention. *See, e.g.,* ECF No. 16-1 at 12; ECF No. 41 at 13. Genesis also has shown that, under cases such as *Dawson*, other I-3 detention facilities or other temporary detention facilities are proper comparators for these purposes. A "building, facility, or structure used, in whole or in part, to house or detain individuals for federal civil immigration violations" is similarly situated to a building or facility used in whole or in part to house or detain individuals for state civil violations. Md. Code. Ann., Corr. Servs. § 1-101(j). Neither the County nor the State contend that § 1-102(b) would apply if the State or the County wanted to construct or renovate a building to serve as a new courthouse with a holding cell to detain individuals for civil violations. As such, Genesis has shown that § 1-102(b) applies to Genesis and the Elkridge Property differently than it would a similarly situated structure.

And this burden, in addition to taking direct aim at an exclusively federal function, is an "unfavorable" burden as the Supreme Court has used that term in the intergovernmental immunity context. True, § 1-102 does not *prohibit* the construction of immigration detention facilities by private parties. *But cf. CoreCivic*, 145 F.4th at 320 (the law at issue "ban[ned] the state, its local governments, and private parties from making, renewing, or extending any contract to detain people for civil immigration violations"); *Geo Grp*, 50 F.4th at 750, 752 (the law at issue prohibited any private person from operating a private detention facility within the state but "d[id] not prohibit the federal government from leasing existing facilities owned by private companies"). But as explained above, there is no "de minimis exception" to the

47

discrimination intergovernmental immunity doctrine. *California*, 921 F.3d at 883–84; *see also Pub. Utils. Comm'n of Ca. v. United States*, 355 U.S. 534, 543–46 (1958) (holding that the delay caused by a state statute that applied only to the federal government violated the Supremacy Clause); *Leslie Miller*, 352 U.S. at 190 (holding that the delay caused by the state setting license requirements on federal contractors in addition to those set by the federal government violated the Supremacy Clause).

And in any event, the burden is not de minimis—at least in the context in which Genesis's claim has arisen. If the County had invoked § 1-102(b) at the outset of the permit approval process and conducted the notice and comment envisioned by that statute concurrent with the ordinary permit approval process, the County might have a point, factually, that such notice-and-comment would not actually impose a burden (favorable or unfavorable) on Genesis based on its status as a federal contractor or on the Elkridge Property based on its status as a future immigration enforcement facility. But that is not what happened. The County did not invoke § 1-102(b) as a source of delay until after the permits had been issued and the project was nearing completion. And even in the six-plus months since the County revoked the permits, the County has not begun the process that it claims it is required to complete before issuing (or re-issuing) the permits. Thus, the County's application of § 1-102 has unquestionably imposed an unfavorable burden on the federal government, a burden that has been imposed—via the federal government's contractor, Genesis—based on governmental status.

The County and State's remaining arguments fall short.

48

First, the County contends that although it knew when it approved the permits that (a) the Elkridge Facility was for federal law enforcement and (b) the facility included temporary detention cells, it did not realize that the law enforcement agency that was going to use the facility was Immigration and Customs Enforcement. ECF No. 19 at 4 ("The notice and comment opportunity was not provided because Genesis's permit application had not identified the project as an *immigration* detention facility, which is what triggers the state law."); ECF No. 51 at 5. Indeed, it appears undisputed that Genesis did not identify ICE on the permit applications themselves (although the floor plans attached to the permits that the County issued do refer to a "File Room (Alien)" across the hall from the holding cells and directly next door to the "detainee non-contact visitor booth[s]"). ECF No. 39, May 14, 2026 Motions Hearing Transcript 50:10–13 ("And that permit file, that paperwork does not indicate that this is an immigration detention facility."); ECF No. 1-1 at 6. And although at least one ICE official participated in meetings with Howard County officials during the permitting process, the County's Chief of Plan Review (Donald Mock) states that he "do[es] not recall, if [he] ever knew, that personnel from [ICE] participated" in that meeting. ECF No. 53-2, Mock Affidavit ¶ 5. The Court need not resolve those factual disputes about the original *issuance* of the permits for purposes of Genesis's preliminary injunction motion, however, because the pertinent question is whether the County's *revocation* of the permits was because of Genesis's status as a federal contractor. And focusing on the days leading up to and immediately following the February 2, 2026 revocation, the record of the purpose for the County's revocation is clear. As discussed above, Howard County officials on numerous occasions during that time period expressed their intent

49

to target the federal government and ensure that ICE was not able to open a facility within Howard County. *See* § I.C, *supra.* This goes beyond a mere indirect burden to the federal government but, if further proven, goes to an intentional effort to discriminate against the federal government as such. This context supports Genesis's likelihood of success on the merits that the specific context in which § 1-102 was applied here was unconstitutional.

Second, the County and State point to the lease between Genesis and GSA, which manages properties for government agencies. That lease requires Genesis to obtain all necessary permits and comply with state and local laws. ECF No. 34-1 at 67, ¶ 14. Thus, the County argues, that "[t]he federal government imposed the requirement that Genesis get local permits but that choice to voluntarily go through local permitting does not allow the federal government to dictate that the County treat permits to it differently than all other building permits issued for government uses." ECF No. 55-1 at 12; *see* ECF No. 56 at 7, 23–24. There is some force to this argument. But ultimately it falls short of defeating Genesis's claim based on Genesis's showing at this stage because, as a matter of law, a discriminatory state law that unfavorably burdens the federal government or its contractors is valid only if Congress has provided "'clear and unambiguous' authorization" for the state regulation at issue. *U.S. v. Washington*, 596 U.S. at 840 (quoting *Goodyear Atomic*, 486 U.S. at 180). The lease here does not constitute such "clear and unambiguous" authorization for a state or local government to apply a statute that facially discriminates against the federal government in violation of the intergovernmental immunity doctrine. The provision is boilerplate language pulled from GSA's regulations. *See* 48 C.F.R. § 552.270-8. And in any event the

50

provision only required Genesis to comply with "applicable" laws and it is not clear or unambiguous that a discriminatory law is deemed "applicable" for Genesis to follow.

In *U.S. v. Washington*, a federal statute expressly allowed for the application of state workers' compensation laws to federal lands and projects. *Id.* But even that expression of federal legislative intent "d[id] not 'clearly and unambiguously' authorize a State to enact a discriminatory law that facially singles out the Federal Government for unfavorable treatment." *Id.* at 840. "One can reasonably read the statute . . . as only authorizing a State to extend its *generally applicable* state workers' compensation laws to federal lands and projects within the State." *Id.* (emphasis added). Thus, even assuming (without deciding) that boilerplate language in a real estate lease could satisfy the expression of *Congressional* intent that the Supreme Court requires to overcome intergovernmental immunity, the lease here between GSA and Genesis comes nowhere close to "clearly and unambiguously" establishing such federal authorization.

Third, the County and State argue that "[f]ederal law does not [and cannot] compel the County to grant a permit approving the construction of this federal building" without violating the Tenth Amendment. ECF No. 53 at 12 (emphasis omitted). Defendants contend that this argument is heightened by the fact that "the building permit at issue is a voluntary choice by the federal government and not a mandate by the state or county" in light of cases in other contexts exempting the federal government from local building permits. ECF No. 65 at 2–3 (citing *U.S. Postal Serv. v. Town of Greenwich, Conn.*, 901 F. Supp. 500, 507 (D. Conn. 1995); *U.S. Postal Serv. v. City of Hollywood, Fla.*, 974 F. Supp. 1459, 1465 (S.D. Fla. 1997)); ECF No. 55-1 at 11–12. But that contention is beside the point, because the County, having concluded that

the Elkridge Property satisfied all requirements for permitting *other than § 1-102(b)*, revoked the permits solely on the basis of § 1-102(b). It is the revocation that is at issue, and it is the revocation pursuant to § 1-102(b) that Genesis has shown violated the Supremacy Clause.

*        *        *

For these reasons, Genesis has shown that it is likely to succeed on the merits of the discrimination-based theory of its intergovernmental immunity claim. Thus, the County's motion to dismiss Count 1 will be denied and the Court will proceed to the remaining factors pertinent to Genesis's motion for a preliminary injunction.

### E.    Remaining Preliminary Injunction Factors

#### 1.    Irreparable Harm

In order to establish irreparable harm for the second *Winter* element, "the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.' Additionally, the harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)) (internal citations omitted). "[W]here 'monetary losses are so severe as to threaten insolvency,' there may be irreparable harm." *Harbor Side Grill, LLC v. City of Annapolis, Md.*, Case No. 26-cv-0714-RDB, 2026 WL 636867, at *16 (D. Md. Mar. 6, 2026) (quoting *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 499 (D. Md. 2020); citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691,

52

694 (4th Cir. 1994)). This is particularly true where economic "damages may be unobtainable from the defendant," such as claims against government defendants where, as here, damages are not recoverable. *Hughes Network Sys.*, 17 F.3d at 694 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)).

Genesis alleges that the construction on the Elkridge Property required a significant upfront investment, with over $21 million spent to date. ECF No. 16-2, Hartsell Decl. ¶ 30. With construction suspended following the County's revocation of the permits, Genesis is currently accruing interest of approximately $5,000 each day, ECF No. 16-1 at 35, and is unable to collect the monthly rent of approximately $132,000 it would be receiving from the federal government had it been able to turn over the building in March as planned, ECF No. 16-2, Hartsell Decl. ¶ 28. These damages are linked to the need for a preliminary injunction as the lack of a permit is the only impediment to Genesis finishing construction and turning the property over to the federal government, which would then start paying rent for its use. Genesis also contends that its bankers have refused to lend funds to Genesis for any other properties until the Elkridge Property is turned over to the federal government and that bankruptcy is now a possibility for them. *Id*. ¶ 33. Further, in light of the fact that the Defendants will not be liable for economic damages, *see* § III.B, *supra*, these monetary harms are not recoverable at the end of litigation. Therefore, Genesis has established that it would suffer irreparable harm absent a preliminary injunction.

### 2.    Balance of Equities and Public Interest

The final two *Winter* factors are balance of the equities and the public interest. These factors merge when the government is the opposing party. *See Nken*, 556 U.S. at

435. "[T]he balance of the equities favors preliminary relief because '[our] precedent counsels that [the government] is in no way harmed by issuance of a preliminary injunction which prevents the [government] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction.'" *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)) (cleaned up). Similarly, "[t]here is a strong public interest in curing the effects of the government's unlawful acts." *Am. Fed'n of Tchrs. v. Bessent*, 765 F. Supp. 3d 482, 505 (D. Md. 2025) (quoting *CACI, Inc.– Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 279 (E.D. Va. 2023)) (internal quotations omitted).

Genesis has shown a likelihood of success in proving that § 1-102 was applied to the Elkridge Property in violation of the Supremacy Clause and that it will be irreparably harmed without injunctive relief. The balance of equities and public interest support a requirement that the government correct its likely unconstitutional acts.

### F.    Bond

A court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The United States, its officers, and its agencies are not required to give security." *Id.*

Defendants here request that the Court impose "proper financial security by Genesis to prevent harm to the State." ECF No. 19 at 11 n.2. Genesis responds that, because Defendants do not request a specific amount of bond or articulate a non-conclusory reason for bond, the Court should follow other courts that "have imposed

bonds in a nominal amount or even in the amount of zero." ECF No. 29 at 20 n.15

(citing *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 861 (D.

Md. 2025), and *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315

(D.D.C. 2025)). But both cases Genesis cites involved defendants that were federal

officials in their official capacities. Rule 65 expressly carves out the federal government,

its officers and its agencies from the requirement to "give security." Fed. R. Civ. P.

65(c). Thus, the Court denies Genesis's request to be excused from the bond

requirement in Rule 65. But the County also has not come forward with evidence of

concrete economic harm to the County from the imposition of this preliminary

injunction, let alone distilled that harm into a specific amount of bond that the Court

should order. The Court will set bond in the amount of $20,000.00.

## V.    CONCLUSION

For these reasons, Genesis's motion for preliminary injunction will be granted

based on the discrimination-based intergovernmental immunity doctrine under Count

1. Defendants' motion to dismiss will be granted in part and denied in part. It will be

granted as to Counts 2 and 3; it will be denied as to Count 1.[13] A separate order follows.

---

[13] In their original motion to dismiss, Defendants stated that "[t]here is no such legal or governmental entity known as the Howard County Department of Inspections, Licenses and Permits," and that instead, the Howard County Government is the only viable entity to sue and be sued on behalf of its departments. ECF No. 181 at 3–4 n.1. Defendants re-raise this issue in their motion to dismiss the amended complaint and add that "[t]he enactment of CB 16-2026 was the only action the Councilmembers were alleged to have taken in any capacity," and therefore in light of the Court's partial dismissal of claims related to CB 16-2026, these Defendants should be dismissed as well. ECF No. 55 at 1–2 n.1. Genesis does not identify any reason that the Amended Complaint states claims on which relief can be granted against any of those Defendants. For these reasons, all

Date:  August 10, 2026                    _____/s/_____
                                          Adam B. Abelson
                                          United States District Judge

---

claims against Defendants Howard County Department of Inspections, Licenses and Permits and Councilmembers Opel Jones, Christiana Rigby, Deb Jung, Liz Walsh, and David Yungman will be dismissed.